Angelo PRIETO, Trustee of the Brett
M. Davis Insurance Trust, and Brett
M. Davis, individually, Plaintiffs,

v.

JOHN HANCOCK MUTUAL LIFE
INSURANCE COMPANY, et
al., Defendants.

No. CIV. A. 3:97–CV–2441–L.

United States District Court,
N.D. Texas,
Dallas Division.

Jan. 12, 2001.

---

Scott J Scherr, Payne Watson Kling Miller & Malechek, Bryan, TX, Michael Frank Pezzulli, Charles 'Chuck' J Fortunato, Carol E Farquhar, Pezzulli & Loewinsohn, Dallas, TX, for plaintiffs.

Edwin R DeYoung, Roger B Cowie, Locke Liddell & Sapp, Dallas, TX, Gardere Wynne Sewell, Dallas, TX, for John Hancock Mut. Life Ins. Co., defendant.

Greg K. Winslett, Richard Lee Smith, Strasburger & Price, Dallas, TX, for Jim Engram, Jim Engram & Assoc., Gary McGowan, defendant.

### MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

Before the court are Defendant Jim Engram, Individually, d/b/a Jim Engram & Associates' Motion for Summary Judgment and Defendant John Hancock's Motion for Summary Judgment, both filed August 29, 2000.[1] After careful consideration of the motions, responses, briefs, evidence submitted by the parties and applicable law, the court grants Defendants' motions for summary judgment.

### I. *Factual and Procedural Background*[2]

At the time of the events giving rise to this action, Defendant Jim Engram, individually, d/b/a Jim Engram & Associates ("Engram") was an independent insurance agent, selling products of various compa-

---

1. Both motions incorporate by reference the arguments of the other. The court therefore construes both motions as having been made collectively by both Defendants.

2. The facts contained herein are either undisputed or, where they are disputed, presented in the light most favorable to Plaintiffs as the nonmovants.

**510**

nies including those of Defendant John Hancock Mutual Life Insurance Company ("Hancock"). Engram was an experienced insurance agent with over ten years experience, and a chartered life underwriter. He was based in South Carolina, and was not licensed as an insurance agent in the State of Texas. Engram was also a salesman for Dadecor, a company owned by Plaintiff Brett M. Davis ("Davis"), which sold real estate syndications, private placements, and limited partnerships. Engram initially met Davis in 1981, and they had regular interaction in connection with Engram's employment at Dadecor.

In 1982, Davis discussed the need to acquire life insurance with his tax attorney, who contacted Engram. Engram and Davis met in Dallas in 1983, where Engram presented an illustration ("the 1983 Illustration") of how the proposed $10 million whole life insurance policy would perform. In essence, the program was to work as follows:

- Davis would make payments (totaling $334,400) only during the first seven years of the policy;

- after policy year four, the policy would generate dividends to Davis;[3]

- dividends would be applied to pay the insurance premiums;

- to the extent that dividends were less than the premium amounts, the balance due would be borrowed against the cash value of the policy;

- interest on these loans against the cash value of the policy would be paid either out of dividends or by an additional loan against the policy;

- eventually, as the dividends increased, they would exceed the amounts required for premium and interest payments, at which point they would be applied to reduce the loan balance; and

- after the loan was completely repaid, the excess of dividends over premiums would be used to buy additional insurance coverage.

The program thus would result in a paid up insurance policy for life, with no cash outlay by Davis after the first seven years. The illustration showed, for the next 51 years, the required annual outlay by Davis and the cash value and net death benefit.[4] At the end of that term, the net death benefit was shown as $21,272,780 and the net equity (cash value) was shown as $11,027,120. From the illustration and representations by Engram, Davis' understanding was that: 1) dividends could fluctuate, but the amounts upon which the illustration was based were a minimum; 2) the loan interest rate would be fixed at 8%; and 3) the cash value and net death benefit amounts were guaranteed minimums. The illustration did not show loan amounts, but Davis understood that the program involved loans against the cash value of the policy.

Davis purchased the insurance policy in 1983 based on the illustration and representations by Engram. At that time, Davis was 24 years old and had a net worth in excess of $60 million. His work experience was in real estate and savings and loans; he knew little about life insurance. At the time of his deposition in July 2000, his net worth was negative, due in part to multi-million dollar judgments against him. His annual salary (before bonuses) at the time of his deposition was approximately $110,000.

Shortly after Davis purchased the policy, and upon the recommendation of Engram, he transferred the policy to Stockton Savings & Loan Association

---

3. Hancock was a mutual life insurance company at the time. Policyholders were also owners of the mutual association, and thus received dividends from Hancock's earnings.

4. The net death benefit is the amount of insurance coverage (from the original policy and additional insurance purchased as dividends exceeded the amounts required for premiums and interest payments) reduced by the amount of any policy loan outstanding.

("Stockton"). Davis owned more than 99% of Stockton's stock. Subsequently, Engram suggested that the policy be transferred to a trust. Davis did so in July 1988, creating the Brett M. Davis Insurance Trust ("Trust"). Plaintiff Angelo Prieto ("Prieto"), a certified public accountant and former manager with Arthur Andersen L.L.P., is the trustee of the Trust.

Engram continued to make representations to Plaintiffs about the policy's performance, from 1985 through 1997. These representations included both general statements about the policy's performance and detailed print-outs ("illustrations") of projected results, similar to the 1983 Illustration. Plaintiffs allege that the 1983 Illustration and subsequent representations were misleading and fraudulent, and that in reliance on these misrepresentations Plaintiffs purchased the policy and continued to make premium payments.

Interest rates declined in the mid- to late–1980s, reducing the amount that Hancock could earn on its investments. Dividends to policyholders were reduced slightly, and then dramatically in 1993. A federal class action lawsuit was filed on September 20, 1995 against Hancock. Plaintiffs were members of the putative class. On September 30, 1997, Plaintiffs opted out of the class action settlement. This action was filed on October 3, 1997.

Plaintiffs assert fourteen causes of action arising from the alleged fraudulent behavior by Defendants: 1) violations of § 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b)(1994), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1998), promulgated thereunder; 2) breach of fiduciary duty; 3) negligent misrepresentation; 4) fraudulent inducement; 5) fraudulent concealment and deceit; 6) reckless, wanton and/or negligent supervision; 7) breach of the duty of good faith and fair dealing; 8) breach of contract; 9) fiduciary fraud; 10) knowing participation in fiduciary fraud; 11) negligence and gross negligence; 12)

civil liability under Tex. Civ. Prac. & Rem. Code Ann. § 33.002 (West 1997) for violations of Tex. Penal Code Ann. § 32.45 (West Supp 2000) and Tex. Prop.Code Ann. § 162.031 (West 1995); 13) violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1861 et seq. (1994); and 14) for payment of attorneys' fees incurred in this action.

## II. *Summary Judgment Standard*

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Ragas,* 136 F.3d at 458.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are

not competent summary judgment evidence. *See Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas,* 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id., see also Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Disputed fact issues which are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### III. *Analysis*

Defendants raise several arguments for summary judgment, including among others the following: statutes of limitations; that the insurance policy is not a "security"; that there was no fiduciary relationship between Plaintiffs and Defendants; that there was no duty of good faith and fair dealing under the circumstances; that Plaintiffs did not comply with the necessary conditions upon which the 1983 Illustration was based; that any reliance on the representations at issue was not justified; that "benefit of the bargain" damages are not available for negligence claims; and that there was no "enterprise" for purposes of the RICO claim. Because of its broad application, the court first addresses the statute of limitations issue.

■ In Texas, state law claims arising from breach of contract or fraud are subject to a four-year statute of limitations; claims arising from negligence, breach of fiduciary duty, or breach of the duty of good faith and fair dealing are subject to a two-year statute of limitations. *See Martinez Tapia v. Chase Manhattan Bank, N.A.,* 149 F.3d 404, 411 (5th Cir.1998); *Morriss v. Enron Oil & Gas Co.,* 948 S.W.2d 858, 869 (Tex.App.—San Antonio 1997, no writ); Tex. Civ. Prac. & Rem. Code Ann. §§ 16.003, 16.004 (West Supp. 2000). "A cause of action generally accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy." *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 514 (Tex.1998). Because Plaintiffs allege injury resulting from the purchase of the insurance policy in 1983, they were authorized to seek a judicial remedy at that time. The statutes of limitations for their state law claims therefore began to run in 1983, subject to tolling as discussed below.

■ Claims under Rule 10b–5 " 'must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation.' " *Pacific Mut. Life Ins. Co. v. First RepublicBank Corp.,* 997 F.2d 39, 41–42 (5th Cir.1993) (quoting *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)), *vacated on other grounds,* 514 U.S. 1079, 115 S.Ct. 1789, 131 L.Ed.2d 718 (1995). Civil RICO claims are subject to a four-year statute of limitations; the cause of action accrues "when the plaintiff discovers, or should have discovered, the injury." *Love v. National Medical Enterprises,* 230 F.3d 765, 772–73 (5th Cir.2000).

■ Civil RICO claims are also subject to a special rule when separate underlying predicate acts are committed over a period of time: " 'each time a plaintiff

suffers an injury caused by a [RICO] violation ..., a cause of action to recover damages *based on that injury* accrues to plaintiff at the time he discovered or should have discovered the injury.'" *Id.* at 773 (quoting *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir.1988)) (emphasis added); *see id.* at 774–75 (adopting the *Bankers Trust* "separate accrual" rule). Plaintiffs allege a continuing series of misrepresentations after the initial purchase of the policy and resulting injuries, consisting of Plaintiffs' decisions to continue paying premiums. The "separate accrual" rule would therefore allow these to be considered as equivalent to multiple causes of action.[5] The court has found no authority *directly* addressing this issue in the context of Rule 10b–5 claims, but such an approach seems consistent with those provisions as well as the Fifth Circuit's analysis in contexts other than statutes of limitations. *See, e.g., Hilgeman v. National Ins. Co. of America,* 547 F.2d 298, 302 (5th Cir.1977) (analyzing annual premium payments as independent consummations of the fraudulent scheme, for purposes of determining jurisdiction and venue). The court therefore concludes that the separate accrual rule also applies to causes of action under Rule 10b–5 for statute of limitations purpose.[6]

## A. Tolling—State Law

Plaintiffs assert four theories under which the statutes of limitations for their state law claims should be tolled: the discovery rule, the fraudulent concealment doctrine, the "open courts" provision of the

Texas Constitution, and the class action rule. Plaintiffs argue that under the first three of these doctrines the statutes of limitation were tolled until they discovered "the truth about Defendants' misrepresentations regarding the Hancock's dividends and current investment experience," sometime on or after September 20, 1995, when the class action lawsuit was filed.[7] They further assert that the class action rule tolled the statutes of limitation from the time the class action lawsuit was filed until Plaintiffs opted out of the proposed settlement. Accordingly, they conclude that none of the relevant statutes of limitation had expired by the time they filed this lawsuit on October 3, 1997. As these doctrines differ in their requirements and application, the court considers each in turn.

### 1. Discovery Rule

The discovery rule is a " 'very limited exception to statutes of limitation,'" applicable only " 'where the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable.'" *In re Coastal Plains, Inc.,* 179 F.3d 197, 214 (5th Cir.1999) (quoting *Computer Associates Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455–56 (Tex.1996)). The "inherently undiscoverable" requirement is satisfied when the nature of the injury is unlikely to be discovered even through due diligence. *Id.* This requirement means less than absolute impossibility of discovery, but more than mere failure to discover, an injury that could have been discovered through the exercise of due dili-

5. The injuries related to the subsequent alleged misrepresentations after Plaintiffs purchased the policy, however, would be the premium payments induced by such misrepresentations. Any alleged "benefit of the bargain" of the policy, in terms of the net death benefit and accumulated cash value initially represented in 1983, relates to the policy as a whole rather than individual premiums. Assuming *arguendo* that "benefit of the bargain" damages are available for a civil RICO claim, they would be "based on" the initial misrepresentations that induced Plaintiffs to purchase the policy.

6. Plaintiffs do not specifically assert this theory in their Response Brief or Third Amended Complaint, and arguably have not made a claim for recovery of the premiums. Because the parties dispute the effect of the statute of limitations, however, the court considers it appropriate to raise this particular aspect of the statute of limitations defense *sua sponte.*

7. Plaintiffs' Response Brief at 29.

gence does not satisfy the requirement. *Id.* at 215. "The requirement of objective verifiability requires physical or other evidence, such as an objective eyewitness account, to corroborate the existence of the claim." *Id.*

The court seriously doubts whether Plaintiffs' claims meet the "inherently undiscoverable" requirement. Investment decisions, particularly those involving large amounts of money,[8] by their nature demand due diligence:

> Courts recognize that financial investment involves attendant risks. The investor who seeks to blame his investment loss on fraud or misrepresentation must himself exercise due diligence to learn the nature of his investment and the associated risks. As several courts have recognized, the party claiming fraud and/or misrepresentation must exercise due diligence to discover the alleged fraud and cannot close his eyes and simply wait for facts supporting such a claim to come to his attention. This principle applies in a variety of contexts, including the issue presented in this case. when the applicable statutes of limitations begin to run.

*Martinez Tapia,* 149 F.3d at 409 (footnote omitted). Appropriate inquiry could have disclosed the following information: 1) that the success of the investments depended upon the policyholder's tax situation,[9] the dividend rate (which in turn depended on Hancock's success in investing), and the interest rate charged on loans against the policy; 2) the interest rate on the actual policy was variable; and 3) the dividend rate was not guaranteed, and in fact Hancock might pay no dividends at all. That should have been sufficient for any reasonable person, and particularly for experienced businesspeople such as Plaintiffs, to

realize that the alleged representations by Engram, that the net death benefit and cash value amounts were guaranteed minimums, could not be true.

■ The court need not decide the issue of "inherently undiscoverable," however, because this case clearly fails to meet the "objectively verifiable" requirement. There is *some* documentary evidence involved, for example, the 1983 Illustration and similar illustrations or projections, and the policy itself. The court concludes, however, that this evidence is by itself insufficient to establish the existence of Plaintiffs' claims. With the exception of the breach of contract claim, Plaintiffs' claims all rely to some extent on alleged fraudulent misrepresentations inconsistent with the policy Even when those alleged misrepresentations were in written form *and* specific, for example in the 1983 Illustration and similar illustrations or projections, the court concludes that they do not constitute conclusive evidence of fraudulent misrepresentations. "An injury is 'objectively verifiable' if the presence of injury and the producing wrongful act cannot be disputed." *Howard v. Fiesta Tex. Show Park, Inc.,* 980 S.W.2d 716, 720 (Tex. App.—San Antonio 1998, pet. denied)). To satisfy the objectively verifiable standard, "the evidence must rise to a higher level of certainty" than the preponderance of the evidence for liability. *S.V. v. R.V.,* 933 S.W.2d 1, 19 (Tex.1996). That standard clearly has not been met. Plaintiffs' allegations amount to little more than " 'a swearing match between parties over facts and between experts over opinions,' " *Coastal Plains,* 179 F.3d at 215 (quoting *S.V.,* 933 S.W.2d at 15), insufficient by themselves to meet the objectively verifiable requirement. Similarly, the breach of contract claim would require evidence that a contract had been formed.[10] Plaintiffs

---

**8.** The 1983 Illustration reflected out-of-pocket premium payments in excess of $300,000, resulting after 51 years in a net death benefit over $21 million and cash value over $11 million.

**9.** The 1983 Illustration noted at the top: "Tax Bracket: 50%—Interest Deductible."

**10.** That claim is based on alleged promises before the issuance of the policy and subsequent modifications, not the actual policy is-

provide no objective evidence sufficient to establish beyond dispute that such a contract had been formed. Because Plaintiffs have not satisfied the "objectively verifiable" requirement for any of their state law claims, the court concludes that the discovery rule does not apply.

### 2. Fraudulent Concealment

■ The fraudulent concealment rationale for tolling the statute of limitations differs somewhat from the discovery rule.

> Although similar in effect, the discovery rule exception and deferral based on fraud or concealment exist for different reasons. Unlike the discovery rule exception, deferral in the context of fraud or concealment resembles equitable estoppel. "[F]raudulent concealment estops the defendant from relying on the statute of limitations as an affirmative defense to [the] plaintiff's claim."

*Computer Associates Int'l,* 918 S.W.2d at 456 (quoting *Borderlon v. Peck,* 661 S.W.2d 907, 908 (Tex.1983)). Fraudulent concealment "tolls the statute [of limitations] until the fraud is discovered or could have been discovered with reasonable diligence." *Velsicol Chemical Corp. v. Winograd,* 956 S.W.2d 529, 531 (Tex.1997).

In its analysis of arguments for tolling applicable statutes of limitations, the Texas Supreme Court has consistently held that

> [A] party asserting *fraudulent concealment* has the burden to come forward with proof raising an issue of fact with respect to [that claim]. Any other result would be unfair to defendants who properly assert limitations as a defense. A mere pleading or a response to the summary judgment motion does not satisfy this burden of coming forward with sufficient evidence to prevent summary judgment.

*American Petrofina, Inc. v. Allen,* 887 S.W.2d 829, 830 (Tex.1994) (internal quota-

tion marks and citations omitted) (emphasis added). Plaintiffs contend that Defendants have " 'the burden to negate [the *discovery rule's* ] application and prove that there is no genuine issue of material fact concerning the time the plaintiff discovered, or using reasonable diligence should have discovered, the nature of his injury.' " *See* Plaintiffs' Response Brief at 30 (quoting *Roe v. Walls Regional Hosp., Inc.,* 21 S.W.3d 647, 652 (Tex.App.—Waco 2000, no pet.)) (emphasis added). *Roe* does not govern assertions of *fraudulent concealment* to toll the statute of limitations, though; *American Petrofina* does. Further, even assertions of the discovery rule place the burden of proof on Plaintiffs in federal court.

> Under Texas law, the burden of proof *at trial* with respect to all of the theories urged by a plaintiff for the suspending or tolling the running of limitations is on the plaintiff.... Texas *procedural law* requires a summary judgment movant relying on limitations to negate the discovery rule, when invoked, by showing by undisputed summary judgment evidence that the plaintiff discovered, or should have discovered, the facts giving rise to his claim. However, under federal practice the burden of adducing evidence at the summary judgment stage parallels the burden of proof that would exist at the trial stage.

*Porter v. Charter Medical Corp.,* 957 F.Supp. 1427, 1436 (N.D.Tex.1997) (citation omitted) (emphasis added). Plaintiffs therefore must provide competent summary judgment evidence supporting their allegations of fraudulent concealment in order to toll the statute of limitations under this doctrine.

■ Texas courts have adopted several different formulations of the necessary elements for a showing of fraudulent concealment to toll a statute of limitations. *See, e.g., Mellon Service Co. v. Touche Ross & Co.,* 17 S.W.3d 432, 436 (Tex.App.—Hous-

---

sued. Plaintiffs do not allege that Defendants breached the terms of the insurance policy

itself. *See* Plaintiffs' Third Amended Complaint, ¶¶ 83–86.

ton [1st Dist.] 2000, no pet.) ("(1) actual knowledge of the wrong; (2) a duty to disclose the wrong; and (3) a fixed purpose to conceal the wrong"); *Advent Trust Co. v. Hyder*, 12 S.W.3d 534, 541 (Tex. App.—San Antonio 1999, pet. denied) ("1) an underlying tort; 2) the defendant's knowledge of the tort; 3) the defendant's use of deception to conceal the tort; and 4) the plaintiff's reasonable reliance on the deception"); *Li v. University of Tex. Health Science Center at Houston*, 984 S.W.2d 647, 653 (Tex.App.—Houston [14th Dist.] 1998, pet. denied) ("1) the defendant had actual knowledge of the wrong, 2) a duty to disclose the wrong, and 3) a fixed purpose to conceal the wrong"); *Santanna Natural Gas Corp. v. Hamon Operating Co.*, 954 S.W.2d 885, 890 (Tex.App.—Austin 1997, pet. denied) ("first, actual knowledge by the defendant that a wrong has occurred, and second, a fixed purpose to conceal the facts necessary for the plaintiff to know that it has a cause of action"). The element of "duty to disclose the wrong" in *Mellon Service Co.* and *Li* is not an absolute requirement; it is a supplemental requirement applicable to "a party relying on passive fraud [rather than active misrepresentation] to sustain a fraudulent concealment defense." *Id.* at 890–91. Similarly, the requirement of reasonable reliance mentioned in *Advent Trust Co.* actually overlaps with the application of the rule. The statute of limitations is tolled "until the fraud is discovered or could have been discovered with reasonable diligence." *Velsicol Chemical Corp.*, 956 S.W.2d at 531. This is equivalent to a requirement of reasonable reliance, because "[o]nce the plaintiff knows or should have known of the deceit, reliance is no

longer reasonable." *McNeil Pacific Investors Fund 72, Ltd. v. Ernst & Young*, 1995 WL 447557, at *3 (Tex.App.—Dallas July 28, 1995, writ denied). Accordingly, the court concludes that the most appropriate statement of the requirements for a fraudulent concealment defense to a statute of limitations is that in *Santanna Natural Gas Corp.*

Plaintiffs did not directly address these requirements in their discussion of the statute of limitations issue, but did address them indirectly in their response to other issues. After reviewing the summary judgment evidence (including depositions of both Plaintiffs, letters, illustrations, and Hancock's internal documents),[11] the court concludes that Plaintiffs have satisfied their burden of providing evidence from which a reasonable juror *could* conclude that Defendants made material misrepresentations, knew that they were misrepresentations, and sought to conceal that fact from Plaintiffs. Their evidence is certainly not conclusive, but is at least sufficient to raise a fact issue. The court therefore concludes that the fraudulent concealment doctrine applies in this case, and tolls the statutes of limitations on Plaintiffs' state law claims until the alleged fraud was discovered, or could have been discovered through due diligence by Plaintiffs.

### 3. Open Courts Provision

 Plaintiffs also assert that the Open Courts provision of the state constitution[12] "prevents a reading of the applicable statutes of limitations that denies Plaintiffs a reasonable time to discover their claims against the Hancock and to bring suit."[13] This argument is clearly insufficient. The Texas Supreme Court

---

11. For example, depositions by both Plaintiffs refer to several representations by Engram that are inconsistent with the policy actually issued, including interest rate and guarantees as to dividends and performance. In addition, Hancock's internal documents discuss several risks associated with such policies that, according to Plaintiffs' depositions, were never disclosed to them. Engram admitted in his deposition that one of his statements to

Davis in 1992 *"could* have been a little misleading." (emphasis added).

12. Tex. Const. art. 1, § 13. "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."

13. Plaintiffs' Response Brief at 47.

has held that "a litigant alleging a violation of this guarantee must first show the abrogation of a cognizable common law cause of action and second, that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute." *Computer Associates Int'l,* 918 S.W.2d at 458. Plaintiffs make no attempt whatsoever to conduct such a balancing, or indeed to show that their causes of action were "abrogated."

Texas courts have included within "abrogation" such situations as "application of a two-year statute of limitations *without a discovery rule exception,*" *id.* (emphasis added); a statute that totally *eliminates* the cause of action by "exempt[ing] the city from liability for damage to property or injuries to persons willfully or intentionally inflicted," *Lebohm v. City of Galveston,* 154 Tex. 192, 275 S.W.2d 951, 952 (1955); or a requirement often impossible to meet, such as that a plaintiff must have provided "notice of the defect, to be made by one ignorant of its existence, twenty-four hours before the subsequent injury," *Hanks v. City of Port Arthur,* 121 Tex. 202, 48 S.W.2d 944, 948 (1932).

The court has applied the discovery rule and the fraudulent exception doctrine in this case, even though concluding that Plaintiffs did not satisfy the former. Even the "[f]ailure to permit a discovery rule exception ... does not [necessarily] abrogate a common law right." *Computer Associates Int'l,* 918 S.W.2d at 458. The court concludes that when these two different tolling doctrines are *available* for Plaintiffs' causes of action, even though Plaintiffs do not meet the requirements for one of them, those causes of action have not been abrogated and the Open Courts provision has not been violated. The court therefore need not conduct a balancing of abrogation of the causes of action against the purposes of the applicable statutes of limitations.

### 4. Class Action Rule

■ A class action lawsuit, involving comparable claims of deceptive and misleading sales practices, was filed against Hancock on September 20, 1995. *Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. 54, 58 (D.Mass.1997). A settlement, subject to approval by the court, was reached on June 6, 1997. *Id.* at 59. Plaintiffs exercised their right to opt out of the proposed settlement on September 30, 1997 and filed this lawsuit three days later. Plaintiffs now contend that the statutes of limitations for their causes of action should be tolled during the period from the filing of the class action suit until they opted out of the settlement.

Whether Plaintiffs' contention is an accurate statement of the law in Texas is not entirely clear. In *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 552–53, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the United States Supreme Court held that filing a federal class action law suits tolled statutes of limitations for potential class members pending certification of the class. That case, however, "involved the tolling effect of putative federal class actions on *federal* statutes of limitations." *Vaught v. Showa Denko K.K.,* 107 F.3d 1137, 1144 (5th Cir.1997) (emphasis added). Texas recognizes a similar tolling principle for state statutes of limitation based on a *state* class action lawsuit involving *property damage* claims. *Bell v. Showa Denko K.K.,* 899 S.W.2d 749, 757–58 (Tex.App.—Amarillo 1995, writ denied) (citing *Grant v. Austin Bridge Constr. Co.,* 725 S.W.2d 366 (Tex.App.—Houston [14th Dist.] 1987, no writ)). State statutes of limitation are *not* tolled, however, based on a *federal* class action lawsuit involving *personal injury* claims. *Id.*

The Fifth Circuit has summarized Texas law on this issue as follows:

> In the light of *Bell,* we understand Texas' tolling rule to operate as follows: A state (Texas) class action that raises property damage-type claims tolls a Texas statute of limitations pending a certification ruling. And, consistent with our understanding of this Texas

tolling rule, it is unclear whether, under this rule, a federal class action filed in Texas or in any other State would ever toll a Texas statute of limitations, regardless of the type of claims raised. *Vaught,* 107 F.3d at 1147 (holding that "the well-established federal practice on class action tolling .... does not trump the Texas tolling rule"). *Vaught* declined to extend *Bell* to toll state statutes of limitation for a personal injury claim based on a federal class action lawsuit. *Id.* at 1144. Although the Fifth Circuit did not need to resolve the issue presented here, that is, whether a federal class action lawsuit involving property damage claims tolls Texas statute of limitations, it is now necessary to do so.

*Bell* noted that "[t]he basic premise of the *American Pipe* ruling is that a statute of limitations can be tolled while class allegations are pending, provided the defendant has notice of the type and potential number of the claims against it." *Bell,* 899 S.W.2d at 758. The *Bell* court indicated that the distinction between "injury to certain property [and] personal injury .... is important in determining whether the defendants have received fair notice of the existence of a claim by the filing of a class suit." *Id. Bell's* holding was restricted to "the filing of a mass personal injury suit, in a federal court, in another state, with the variety of claims necessarily involved in such a case." *Id* The court concludes that, of the two factors distinguished in *Bell*—the forum ("federal court, in another state"), and the type of claim (personal injury), the latter had the most influence on the decision by the *Bell* court. The court further concludes that the difference in forum has little if any impact on whether "the defendant has notice of the type

and potential number of the claims against it." *Id.* The court therefore believes that, if presented with the issue, Texas courts would interpret the class action tolling rule of *Grant* and *Bell* as extending to all property damage claims (where, as here, the type and potential number of claims can easily be determined or estimated) [14] regardless of the forum in which the class action was filed.

The court notes a further distinction between this case and the class action tolling rule of *Grant* and *Bell.* In those cases, the plaintiffs filed suit individually after the class was decertified, *see, e.g., Grant,* 725 S.W.2d at 370 ("The statute of limitations remains tolled for all members of the class until class certification is denied. At that point, class members may elect to file individual suits or to intervene as plaintiffs in the original action."), rather than as a result of opting out of a proposed class settlement. Texas courts have not directly addressed this issue, but one court did apply the tolling rule to a suit filed by the Attorney General under the Texas Deceptive Trade Practices Act, which it analogized to a de facto class action. *See Bara v. Major Funding Corp. Liquidating Trust,* 876 S.W.2d 469, 471–73 (Tex.App.— Austin 1994, writ denied). That case involved a similar "opt out" from a settlement reached in the Attorney General's suit. *Id.* The court therefore believes that Texas courts would apply the class action tolling rule not only when a putative class is decertified but also when plaintiffs opt out of a class action settlement.

 Any such tolling, however, applies only as to claims against Hancock, not to claims against Engram. Engram was not a defendant in the class action suit. Despite the current uncertainties as to the

---

14. For at least some purposes, Texas law characterizes injuries such as Plaintiffs' as "economic loss," distinct from "property damage." *See, e.g., Two Rivers Co. v. Curtiss Breeding Serv.,* 624 F.2d 1242, 1245–46 (5th Cir.1980). The court concludes, however, that economic loss is comparable to property damage claims for purposes of the distinction

in *Bell.* In fact, "the type and potential number of the claims" are probably more easily determined for economic losses than for property damages. The court therefore believes that Texas courts would treat claims of economic loss at least as favorably as property damage claims for purposes of the class action tolling rule.

scope of the Texas tolling rule, it clearly does not extend to defendants who were not parties to the class action suit. *See Bell,* 899 S.W.2d at 758 ("inasmuch as they were not named as defendants in the class action, the tolling theory would not apply to them").

### B. Tolling—Federal Law

 The equitable tolling or fraudulent concealment doctrine, under which the statute does not run until a plaintiff knows, or through the exercise of reasonable diligence would have known, of the injury, is not available for Rule 10b–5 claims. *Lampf,* 501 U.S. at 363, 111 S.Ct. 2773. The doctrine is, however, available for civil RICO claims. *Love,* 230 F.3d at 779.[15] "[A] plaintiff may invoke the fraudulent concealment doctrine only by proving two elements: first, that the defendants concealed the conduct complained of, and second, that [the plaintiff] failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." *State of Tex. v. Allan Constr. Co.,* 851 F.2d 1526, 1528 (5th Cir. 1988) (internal quotation marks and citations omitted) (discussing fraudulent concealment in the context of Clayton Act violations). For the reasons noted above in the discussion of state law, the court concludes that Plaintiffs have provided sufficient competent summary judgment evidence to establish a fact issue as to fraudulent concealment, and therefore the fraudulent concealment or equitable tolling doctrine will apply to Plaintiffs' RICO claim.

 The court has found no Fifth Circuit precedent clearly establishing class action tolling for Rule 10b–5 claims; the availability of that doctrine might be questionable given the holding in *Lampf* that the three-year period of repose as "fundamentally inconsistent" with equitable toll-

ing. *See Lampf,* 501 U.S. at 363, 111 S.Ct. 2773. The court also has found no Fifth Circuit precedent clearly establishing class action tolling for civil RICO claims. Other circuits, however, have concluded that class action tolling *is* available in at least some circumstances for both Rule 10b–5 claims, *see, e.g., Joseph v. Wiles,* 223 F.3d 1155, 1166–68 (10th Cir.2000) (class action tolling is "legal rather than equitable in nature" and *Lampf's* holding is therefore inapposite); *Griggs v. Pace American Group, Inc.,* 170 F.3d 877, 881 (9th Cir. 1999), and civil RICO claims, *see, e.g., Ballen v. Prudential Bache Securities, Inc.,* 23 F.3d 335, 337 (10th Cir.1994) (incorrectly referring to class action tolling as "equitable tolling"); *Bankers Trust Co.,* 859 F.2d at 1105 (2d Cir.1988); *Cullen v. Margiotta,* 811 F.2d 698, 720–21 (2d Cir.1987). Absent guidance from the Fifth Circuit, the court adopts the conclusions of these other circuits and concludes that class action tolling is available for both categories of claims.

 The question of whether class action tolling applies not only when a class is decertified but also when a plaintiff later opts out of the class action settlement is less clear. The Supreme Court has suggested in dicta that the statute of limitations is tolled until the class action is no longer pending for that plaintiff, either because the class is decertified or because the plaintiff opts out. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176 n. 13, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The Fifth Circuit has noted a "very real controversy as to whether *Eisen* extends *American Pipe* to situations in which a class action member opts out and files separate suit," but declined to rule on the question. *Wood v. Combustion Engineering, Inc.,* 643 F.2d 339, 346–47 (5th Cir.1981) (Rule 10b–5 case). The Second Circuit suggests that the statute of limitations is not tolled

**15.** The Fifth Circuit's formulation for when the cause of action accrues for civil RICO claims and when, under fraudulent concealment, the statute of limitations begins to run,

both discussed in *Love,* are virtually identical. The court concludes that this doctrine really adds nothing for civil RICO claims.

in that situation, *see Arneil v. Ramsey,* 550 F.2d 774, (2d Cir.1977) (Rule 10b–5 case), while other circuits have come to the opposite conclusion, *see, e.g., Realmonte v. Reeves,* 169 F.3d 1280, 1283–84 (10th Cir. 1999) (Rule 10b–5 case); *Tosti v. City of Los Angeles,* 754 F.2d 1485, 1488 (9th Cir. 1985) (sex discrimination case); *Appleton Elec. Co. v. Graves Truck Line, Inc.,* 635 F.2d 603, 610 (7th Cir.1980) (putative *defendant* class).

The court agrees with those circuits that saw no relevant distinction between a class decertification and a decision to opt out of a class settlement. The purpose behind class action tolling rules is to promote

> the efficiency and economy of litigation which is a principal purpose of the procedure. Potential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable.... a rule requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions.

*American Pipe,* 414 U.S. at 553–54, 94 S.Ct. 756. This rationale equally supports tolling for those who would have to anticipate whether the result obtained in the class action suit/settlement would be adequate. In the absence of guidance from the Fifth Circuit, the court adopts the holdings of *Realmonte. Tosti,* and *Appleton Electric,* and concludes that the class action tolling rule is available to toll the statutes of limitation for civil RICO claims and Rule 10b–5 claims, not only when a class is decertified but also when putative class members opt out of the settlement.

The court therefore concludes that class action tolling is available for both of Plaintiffs' federal claims. As noted in the discussion of state law, however, class action tolling is not available with respect to claims against Engram because he was not a defendant in the class action lawsuit.

## C. Application

■ To summarize, Plaintiffs' state law claims have statutes of limitation of either four years (breach of contract and fraud claims) or two years (claims based on negligence, breach of fiduciary duty, or breach of the duty of good faith and fair dealing), but the limitations period begins to run for these claims only when "the fraud is discovered or could have been discovered with reasonable diligence," *Velsicol Chemical Corp.,* 956 S.W.2d at 531, because of the fraudulent concealment doctrine. The civil RICO claim has a four-year statute of limitations, which begins running "when the plaintiff discovers, or should have discovered, the injury." *Love,* 230 F.3d at 773. This is essentially the same result as tolling under the fraudulent concealment doctrine, which also applies to the civil RICO claim. The Rule 10b–5 claim "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation," *Lampf,* 501 U.S. at 364, 111 S.Ct. 2773, but tolling under the fraudulent concealment doctrine is not available. Finally, the statutes of limitations for all claims are tolled (against Hancock only) from the date the class action lawsuit was filed, September 20, 1995, to the date that Plaintiffs opted out of the proposed settlement, September 30, 1997.

■ The key to this determination is when Plaintiffs discovered the alleged fraudulent misrepresentations, or would have discovered them by reasonable diligence. As noted above, Plaintiffs assert that this did not occur, and the statutes of limitation did not begin to run, until sometime on or after September 20, 1995. The court disagrees. The policy was purchased in 1983. Investment decisions inherently require that the investor exercise diligence rather than relying on any oral representations. *Martinez Tapia,* 149 F.3d at 409. As noted above, appropriate inquiry presumably would have disclosed sufficient information to detect the alleged misrepresentations at an early stage.

Plaintiffs do not challenge this assumption, but assert that it was reasonable to rely on Engram's representations rather than conducting such inquiry. In support of that assertion, they further assert a fiduciary relationship between Engram and Davis, which Defendants just as forcefully deny.

The court finds it unnecessary to decide whether a genuine issue of material fact has been raised as to the alleged fiduciary relationship, or what effect such a relationship would have on the reasonableness of inquiry; and it also is unnecessary to attempt to resolve the factual disputes about the interpretations of various illustrations concerning how well the policy was performing. Regardless of whether Plaintiffs should have *investigated* the investment more thoroughly, either at the time of the purchase or after various subsequent representations, it is clear that they *actually knew* enough by no later than 1987 to identify the alleged fraud. In his deposition, Davis [16] stated that he received the policy in 1987,[17] and at that time reviewed it and determined that dividends were not guaranteed and that the interest rate on loans was variable rather than fixed at 8%.[18] Both of these facts were clearly inconsistent with the representations allegedly made by Engram, that the interest rate for loans against the policy was 8% and that the dividends were guaranteed minimums.[19]

Davis also understood the basics of how the policy worked at the time he purchased it in 1983: dividends on the policy would result from what Hancock could earn from investing the funds; dividends would be used to pay the premiums and the interest and principal of any loans against the policy; to the extent dividends were insufficient to pay premiums, loans against the policy would furnish the balance; and eventually the dividends would exceed the premiums and be sufficient to pay off the policy loans, at which point additional insurance coverage would be purchased.[20] The court further notes that Davis was aware that Hancock's earnings (which funded any dividends to be paid to policyholders) came from investments in stocks, bonds, and real estate.[21] With this knowledge, and having identified that the interest rate was variable and that dividends were not guaranteed, the court finds that a reasonable person would have understood that the allegedly guaranteed results were, in fact, not certain.

Plaintiffs offer essentially two arguments why they did not have sufficient information at this point to identify the alleged fraud. First, they claim that the differences between the policy and Engram's representations should be ignored because the alleged fraudulent misrepresentations were designed to reassure them and persuade them to ignore those differences. For example, Engram allegedly explained that the variable interest rate would be offset by higher dividends, and "obscured" the disclaimer in the policy (that dividends were not guaranteed) by stating that it was merely a legal requirement and should be ignored. Second, they

16. The court concludes that, given the relationship between Davis and Prieto with respect to this action, knowledge that either possessed should be attributed to the other as well.

17. Presumably before then the policy was being held by Stockton. The court need not address whether Plaintiffs should be charged with knowledge of the contents of a document held by a corporation in which Davis owned over 99% of the stock.

18. Defendants' Joint Appendix at 45–46 (Davis deposition). In 1987, when Plaintiffs first obtained a loan against the policy, the interest rate had declined from 12% to 8 75%. Plaintiffs' Response Brief at 42.

19. Defendants' Joint Appendix at 17–18, 20. Davis further noted that at the time he purchased the policy, he considered the 8% fixed loan rate "a real plus, a real significant value" because 8% "was well below what interest rates were at that time." *Id.* at 20.

20. *Id.* at 17–18

21. *Id.* at 17.

claim that the relevant comparison for the alleged representations was not to the specific details of the policy but to the results obtained. Until much later than 1987, they assert, the policy was doing at least as well (based on accumulated cash value and net death benefit) as Engram had represented it would, and therefore there was no need to investigate and file suit. Neither of these arguments suffices.

The change in the interest rate from fixed to variable is linked to the dividend performance; the court's analysis therefore focuses on the policy disclaimer that dividends were not guaranteed. Plaintiffs rely on Engram's admonition that the disclaimer was meaningless and should be ignored, and cite *Grove v. Principal Mut. Life Ins. Co.*, 14 F.Supp.2d 1101, 1109 (S.D.Iowa 1998) for the proposition that disclaimers do not put a plaintiff on notice "where the defendant purposely obscured the disclaimers." [22] The court does not read *Grove* so broadly as to encompass this situation. In fact, *Grove* involved "artful drafting" and cited to a state court case for the proposition that "A person who has been incessantly assured a given company's policies will afford him complete protection is unlikely to be wary enough to *search* his policy to *find* a provision nullifying his ... protection." *C & J Fernlizer, Inc. v. Allied Mut. Ins. Co.*, 227 N.W.2d 169, 178 (Iowa 1975) (emphasis added). This apparently referred to efforts to keep a plaintiff from noticing a disclaimer rather than, as alleged in this case, to persuade him to ignore a disclaimer once noticed. The court considers the present case more

analogous to *Martinez Tapia*, where the Fifth Circuit concluded that the investor was not entitled to rely on general assertions of the seller when he had constructive knowledge of specific facts that disclosed the risks. *Martinez Tapia*, 149 F.3d at 410–11; *see also McGill v. Goff*, 17 F.3d 729, 733 (5th Cir.1994) ("The terms of the agreement are so contrary to Appellants' alleged understanding of the deal that upon review of the document, Appellants would have been put on notice of Goff's alleged fraud."). Assuming *arguendo* a fiduciary relationship with Engram, the discrepancy in this case still should have raised a red flag for Plaintiffs, sufficient to cause them to investigate further and initiate suit as appropriate. [23] Even an alleged fiduciary relationship, absent discretionary investment authority, [24] "[does] not serve to relieve [the investor] from making a reasonably diligent effort to inform himself about his purchase, and [does] not toll the statute of limitations." *Martinez Tapia*, 149 F.3d at 412. Plaintiffs' failure to investigate further demonstrates naive optimism, not the conduct of a reasonable person.

Plaintiffs' attempts to distinguish *Martinez Tapia* are unconvincing. Inquiry notice based on a discrepancy between oral representations and the actual terms of the written agreement need not require "sophisticat[ion] in the subject of the transaction at issue" [25] when the discrepancy involves such a basic issue as whether dividends are guaranteed The fact that Martinez Tapia could have learned all the details of the investment, if anything, op-

---

**22.** Plaintiffs' Response Brief at 40.

**23.** *Martinez Tapia* did note that the plaintiff "produced no summary judgment evidence that either [defendant] concealed information relating to the risks of the investment." *Martinez Tapia*, 149 F.3d at 412–13. Arguably, that distinguishes *Martinez Tapia* from this case. The court notes, however, that the Fifth Circuit's decision also rested in part on the fact that "[t]he summary judgment record is silent on any inquiry that [plaintiff] directed to [defendants] regarding the possible risks of his investment." *Id.* at 412. The crucial fact

here is Plaintiffs' failure to investigate once the alleged misrepresentations came to their attention, not the fact of the original misrepresentations. In any event, *Martinez Tapia* also found or assumed a fiduciary relationship, which did not change the conclusion.

**24.** Plaintiffs offer no summary judgment evidence of such discretionary investment authority.

**25.** Plaintiffs' Response Brief at 43.

poses Plaintiffs' arguments. Martinez Tapia did not read documents that would have disclosed the alleged discrepancy between representations and the actual investment; Davis did identify the discrepancy by reading the policy. Plaintiffs also do not demonstrate that they made any significant effort to locate documents "which would have apprised Plaintiffs of the actual terms of the investment."[26] Finally, the comment in *Martinez Tapia* that "[t]he summary judgment record makes it clear that the Defendants did not 'hide the ball' from Martinez Tapia" in context clearly refers to the fact that all the necessary information to identify the risks was disclosed in the sales brochure, which further "directed the reader to obtain a copy of the Offering Circular and Subscription Agreement." *Id.* at 410–11. That situation seems indistinguishable from this case for purposes of determining when Plaintiffs had adequate knowledge of the alleged misrepresentations. Plaintiffs admit that they knew in 1987 of discrepancies between the alleged misrepresentations and the actual policy.

■■■ Plaintiffs' second argument, that the relevant comparison for the alleged representations was not to the specific details of the policy but to the results obtained,[27] in essence is that they were not harmed until the policy's actual performance declined below that allegedly guaranteed by Engram. Actual harm, however, is not what starts the statutes of limitations running. *Risk* of harm is sufficient to constitute a legal injury; actual harm is not necessary. *Bankruptcy Estate of Rochester v. Campbell*, 910 S.W.2d 647, 651 (Tex.App.—Austin 1995), *aff'd in part, rev'd in part on other grounds sub nom Murphy v. Campbell*,

964 S.W.2d 265 (Tex.1977). The court is persuaded by the conclusion in *Martinez Tapia* that the statutes of limitations begin to run when the investor has been alerted "that the written terms of his investment varied from the alleged assertions and promises" of the seller. *Martinez Tapia*, 149 F.3d at 411. In that case, the crucial term concerned "the Fund manager's right to suspend redemptions." *Id.* The Fifth Circuit concluded that the statutes of limitation began to run in 1987, when the investor *could have been* alerted of the variance, rather than in 1990, when redemptions were actually suspended. *Id.* Similar treatment here would start the statutes of limitation in 1987, when Plaintiffs *were* aware of the variance, rather than when performance actually declined. Plaintiffs knew that dividends were not guaranteed, the interest rate on loans against the policy was variable, and the dividend rate depended on Hancock's investment success; those facts clearly add up to a substantial risk that the policy would not perform as allegedly guaranteed. Waiting for that risk to be realized before investigating and filing suit was not reasonable.

Based on the above analysis, the court concludes that the statutes of limitation for all of Plaintiffs' state law claims and the civil RICO claim (to the extent based on the initial purchase of the policy) began running no later than mid–1987 when Davis received and read the insurance policy. Since all of those claims have a statute of limitations of four years or less, all expired by mid–1991. The Rule 10b–5 claim (to the extent based on the initial purchase of the policy), for which there is

26. *Id.* at 45.

27. Davis' position was that:
net surrender value ... and death benefits ... were the two items that I would have to use to monitor how the policy was doing .... I knew that they could go up and down, but cumulatively—in other words, if

Hancock did great for two or three years and then they had a bad year, that that wouldn't be cause for alarm because cumulatively they would still be doing better than illustrated, so that became for me my measure.
Defendants' Joint Appendix at 72–73 (Davis deposition).

no equitable tolling for fraudulent conceal-ment, expired no later than 1986, three years after the purchase of the policy. Consequently, the class action tolling rule does not help Plaintiffs, since it cannot revive claims that expire before the class action suit is filed.

This leaves the issue of "separate accru-al," discussed above, under which Plaintiffs can separately recover for each injury (consisting of the decision to continue pay-ing premiums) that occurs within the limi-tations period.[28] This theory applies to Plaintiffs' claims under civil RICO and Rule 10b–5, both of which are also subject to class action tolling. As a result, Plain-tiffs can assert:

- civil RICO claims against Engram (who was not a named defendant in the class action suit) for any premiums paid on or after October 3, 1993;

- civil RICO claims against Hancock for any premiums paid on or after Sep-tember 23, 1991;

- Rule 10b–5 claims against Engram for any premiums paid on or after October 3, 1994; and

- Rule 10b–5 claims against Hancock for any premiums paid on or after Sep-tember 23, 1992.

As discussed above, any such claims would be limited to the amount of the premiums paid, rather than the "benefit of the bargain" from the agreement Plaintiffs thought they had. The court interprets "premiums paid" broadly, to include not only out-of-pocket expendi-tures by Plaintiffs but also premiums paid out of dividends or loans against the

policy, since Plaintiffs theoretically could have increased the cash surrender value or reduced the outstanding loan balance by instructing Hancock to discontinue the insurance.

Even claims limited to premiums paid during the periods shown, however, are not available in this case, for two reasons. First, although the court assumes that such premiums probably have continued to be paid, Plaintiffs provided no summary judgment evidence to demonstrate such payments. Such evidence may lie some-where within the 2,045 page appendix sub-mitted by Plaintiffs, but Plaintiffs point to none and the court is not required to "sift through the record in search of evidence." *See Ragas,* 136 F.3d at 458. Second, even if such evidence *were* available, such pre-mium payments came well after 1987, when the court concludes Plaintiffs were or should have been aware of the alleged fraud. It is fundamentally inconsistent to say that Plaintiffs were on notice of the alleged fraud as early as 1987 but were *not* on notice against continuing to pay premi-ums in 1991. The court therefore con-cludes that the "separate accrual" claims under civil RICO and Rule 10b–5 are also barred.

Accordingly, the court concludes that all of Plaintiffs' claims are barred by the ap-plicable statutes of limitation. Because this forecloses Plaintiffs' action against De-fendants regardless of the merits of the claims,[29] there is no genuine issue of mate-rial fact with respect to this action and Defendants are entitled to judgment as a matter of law. The court therefore grants

---

**28.** As discussed above, it is not clear whether Plaintiffs have asserted such claims In fair-ness to Plaintiffs, however, the court treats their Third Amended Complaint and Re-sponse Brief as having encompassed such in-dividual claims even if not specifically pled.

**29.** Defendants also advance several other ar-guments for summary judgment, including among others: that the insurance policy is not a "security"; that there was no fiduciary relationship between Plaintiffs and Defen-dants; that there was no duty of good faith

and fair dealing under the circumstances; that Plaintiffs did not comply with the neces-sary conditions upon which the 1983 Illustra-tion was based; that any reliance on the rep-resentations at issue was not justified; that "benefit of the bargain" damages are not available for negligence claims; and that there was no "enterprise" for purposes of the RICO claim. Based on its ruling, the court need not address these additional grounds for summary judgment.

summary judgment to Defendants on all claims.

## IV. Conclusion

For the above-stated reasons, there is no genuine issue of material fact present in the record with respect to Plaintiffs' claims. The court makes no determination, and expresses no opinion, as to the merits of those claims, but concludes that Plaintiffs failed to file suit within the time prescribed. Defendants therefore are entitled to judgment as a matter of law. Defendants' motions for summary judgment are **granted,** and Plaintiffs' claims are hereby **dismissed** with prejudice. The court's order of January 2, 2001, scheduling the pretrial conference for January 16, 2001 at 2:00 p.m., is hereby **vacated.** Judgment will issue by separate document.