Richard O. HUNTON and Benny Pace,
Trustee of the Richard O. Hunton
Irrevocable Trust, Plaintiffs,

v.

GUARDIAN LIFE INSURANCE
COMPANY OF AMERICA,
Defendant.

No. CIV.A.H–01–0647.

United States District Court,
S.D. Texas,
Houston Division.

Nov. 16, 2002.

Kent Melvin Hanszen, Attorney at Law, R Scott Wolfrom, Attorney at Law, Houston, for Richard O Hunton, Richard O Hunton Irrevocable Trust Agreement, Benny Pace, Trustee of the Richard O Hunton Irrevocable Trust, plaintiffs.

Jeffrey A Davis, McGinnis Lochridge & Kilgore, Michael E Warrick, Hudgins Hudgins & Warrick, Houston, for the Guardian Life Insurance Company of America, Stephen L Friedman, defendants.

### MEMORANDUM AND ORDER

ATLAS, District Judge.

Pending before the Court is Defendant the Guardian Life Insurance Company of America's Motion to Dismiss Plaintiffs' Second Amended Complaint [Doc. # 14] ("Defendant's Motion"). Plaintiffs responded and Defendant replied.[1] Plaintiffs relied in their Response on substantial material outside of the pleadings. Accordingly, the Court exercised its discretion under Rule 12 to convert Defendants' Motion to a Motion for Summary Judgment. Order, signed September 19, 2001 [Doc. # 21]. Thereafter, both parties submitted supplemental materials.[2] The Court heard oral argument on Defendant's Motion on October 12, 2001. The Court requested

---

1. *See* Plaintiffs' Response to Defendant's Motion to Dismiss [Doc. # 18] ("Response"); Defendant the Guardian Life Insurance Company of American's Reply Memorandum to Plaintiffs' Response to Guardian's Motion to Dismiss [Doc # 20] ("Reply").

2. *See* Defendant the Guardian Life Insurance Company of America's Supplemental Submission Pursuant to this Court's Order Dated September 19, 2001 [Doc. # 25] ("Defendant's Supplement"); Affidavit of Karen C.

Ciotti in Support of Guardian's Supplemental Submission [Doc. # 26] ("Ciotti Aff."); Plaintiffs' Surreply in Support of their Response to Guardian's Motion to Dismiss [Doc. # 27]; Defendant the Guardian Life Insurance Company of America's Reply Memorandum in Further Support of its Motion for Summary Judgment [Doc. # 30]; Plaintiff's Response to Guardian's Motion for Summary Judgment and Supplemental Submission [Doc. # 31] ("Plaintiffs' Supplement").

additional supplemental materials during oral argument.[3] Also pending is Plaintiff's Motion for Leave of Court to File their Amended Complaint [Doc. # 33] ("Plaintiffs' Motion"). Having considered the parties' submissions, the record, and the applicable authorities, the Court concludes that Defendant's Motion should be **granted**, and Plaintiffs' Motion should be **denied**.

## I. BACKGROUND FACTS

Plaintiffs Richard O. Hunton and Benny Pace, as Trustee of the Richard O. Hunton Irrevocable Trust ("Trust"), bring suit against Defendant Guardian Life Insurance Company of America ("Defendant" or "Guardian"), alleging that Guardian misrepresented the amount of premiums due under a Guardian life insurance policy they had purchased.

In 1992, Plaintiffs entered into negotiations with Stephen Friedman an employee and agent of Guardian, to obtain life insurance coverage on Hunton's life. Hunton specifically sought a policy that would require premium payments for a fixed number of years only. Friedman proposed that Plaintiffs purchase from Guardian a life insurance policy (the "Policy") that had "vanishing premiums."[4] Affidavit of Richard O. Hunton, October 8, 2001, at 2 (Exhibit A to Plaintiffs' Supplement) ("Oct. 8, 2001 Hunton Aff."). The concept was that Plaintiffs would pay premiums for a limited amount of time, after which the Policy would be fully paid ("paid up"), *i.e.*, would require no further out of pocket costs for additional premiums. *Id.* Friedman presented Plaintiffs with a "premium payment schedule" issued by Guardian as part of his marketing of the Policy. *Id.* Under the schedule, the owner of the Policy had to pay premiums for seven and a half years with a large up-front initial payment. *Id.* at 3. Friedman assured Plaintiffs that the premiums would vanish as promised because Guardian enjoyed the benefits of a "dividend stabilization fund," which would compensate for or supplement any potential fluctuations in dividends. Oct. 18, 2001 Hunton Aff., at 2; Deposition of Stephen L. Friedman, at 51 (Exhibit B to Plaintiffs' Supplement) ("Friedman Dep."). The details of that fund were not explained to Hunton. Oct. 18, 2001 Hunton Aff., at 2.

The Policy[5] states that premiums will be payable "For Life." *Id.* at 3. The terms

---

3. The Court requested each party to submit an "exemplar" of the life insurance policy at issue in the case. The Court also allowed parties to submit short rebuttals to points raised during oral argument. Plaintiffs submitted the original policy issued to them. Plaintiffs did not file this submission with the Court Clerk, but later filed an affidavit of Richard O. Hunton that attests to the policy's authenticity. Affidavit of Richard O. Hunton, October 18, 2001, at 1 (Exhibit A to Plaintiffs' Supplemental Response to Guardian's Motion for Summary Judgment Following October 12th Hearing [Doc. # 37]) ("Oct. 18, 2001 Hunton Aff."). Defendants submitted an exemplar of the insurance policy. *See* Defendants' Letter in Response to the Court's Request for Certain Information [Doc. # 36]. Plaintiffs also submitted additional materials to the Court. *See* Plaintiffs' Supplemental Response to Guardian's Motion for Summary

Judgment Following October 12th Hearing [Doc. # 37] ("Plaintiffs' Supplemental Response"). Defendant objects to this last submission by Plaintiffs, and requests an opportunity to respond. *See* Letter from Karea C. Ciotti to Judge Nancy F. Atlas, October 22, 2001 [No Doc. #]. Because the Court grants Defendant's Motion and because of the already voluminous record, the Court denies Defendant's request to respond.

4. The Trustee was to be the owner and beneficiary of the Policy.

5. The Plaintiffs submitted the original Policy (Policy No. 3277486) pursuant to a request made by the Court during the October 12, 2001 oral argument. Plaintiffs did not file this Policy with the Court Clerk. However, Hunton affirms that the document submitted "is the original policy provided to me by

of the Policy also provide that the insured will share in the proceeds of "Guardian's divisible surplus." Policy, at 6. If the sum of the cash value of the dividends and the cash value of the Policy in any year is sufficient, the insured may use this sum to pay the annual premium on the Policy. *Id.*[6] Once the Policy is fully paid-up, the insured does not need to make any additional out of pocket premium payments because the premiums will be paid from accumulated dividends. *Id.* Guardian does not state explicitly in the Policy that it will make dividend payments. *Id.* Instead, the Policy's share of dividends, "if any, is determined yearly by Guardian." *Id.* Guardian bases this determination on its "mortality, expense, and investment experience." *Id.* The dividend stabilization fund is not mentioned in the Policy.

Incorporated by reference as part of the Policy is the application for life insurance completed and signed by Hunton ("Application").[7] In the Application, Hunton checked a box indicating that he wished to pay premiums "Annually." *Id.* Under "Section E: Dividends (for participating policies only)," Hunton checked a box that indicated that he wanted the dividends to pay for "One year term insurance not to exceed Target Face Amount

of $ 905,450." *Id.* In this section, Hunton did not check the box that indicated "Vanish Premium-available only if a PUA rider is requested. Premiums to be vanished at the end of the first policy year by use of PUA rider additions and future dividends." *Id.* The Application also contains the following language: "Upon request we will furnish illustrations of benefits, including death benefits and cash values . . . . It is understood that under the Variable Life Insurance Policy the amount of the death benefit . . . may increase or decrease based on the investment experience of the separate account and are not guaranteed." Application, at 3. Nowhere in the Application did Hunton write or otherwise indicate that he agreed to pay premiums for eight years only.

Plaintiffs allege that the Policy contained a two-page "premium schedule"[8] that establishes that the final premium payment would be due in the Policy's eighth year, after which the premium payments were, according to Plaintiffs, guaranteed to vanish. Plaintiffs contend that Friedman delivered the Policy to them in a folder that also contained the Illustrations and that Friedman represented that the Illustrations were part of the Policy. Oct. 8, 2001 Hunton Aff., at 2–3. However, this

Guardian and Friedman." Oct. 18, 2001 Hunton Aff., at 1. Hunton further states: "Admittedly, the Policy has been taken apart on numerous occasions so that copies could be made of the document. Nonetheless, I believe that I have maintained the Policy in the same manner as it was presented to me by Guardian in 1992." *Id.* at 1–2.

6. In the section entitled "Dividends" under the sub-heading "Paid-up Option," the Policy states:

The policy's cash value, including the cash value of any dividend addition and dividends left at interest, may be used to make the policy paid-up. Guardian will so apply the cash value if it equals the net single premium at the attained age for a paid-up

policy in the same face amount as this policy. This option may be exercised by written request. Any policy loans will remain outstanding.
Policy, at 6.

7. The Application is expressly incorporated within the Policy. Application, at 4 ("[T]his Application . . . shall form a part of any Policy issued."); Policy, at 11 ("The entire contract consists of this policy and the attached application.").

8. The schedule pages are marked at the top "page 1 of 6" and "page 2 of 6," and have been inserted at the end of the Policy. The "premium schedule" is titled "Guardian/GIAC Lifeplan Illustrations" ("Illustrations").

contention is contradicted, most significantly, by the terms of the Policy itself.[9] Neither the Policy's "Alphabetical Index," Policy, at 13 (following the various policy riders and a copy of the Application), nor the "Guide to Policy Provisions," Policy, at 2 (summarizing the Policy's contents), refers to these two pages. Indeed, the document is titled "Guardian/GIAC Lifeplan Illustrations" ("Illustrations"). It states that the schedules contain additional "attached sheets with important footnotes" that have not been included with Plaintiffs' exhibit. Illustrations, at 2 of 6.

Hunton consulted with his financial advisors in connection with acquiring the Policy,[10] but he is the person who made the decision to buy it. At Hunton's request, Trustee Pace purchased the Policy with Trust funds and designated the Trust as owner and beneficiary. Guardian issued the Policy on February 4, 1992. On February 13, 1992, Friedman delivered the policy to Hunton in person. Hunton and Friedman reviewed the Policy's provisions together. Hunton questioned Friedman regarding the language in the Policy that indicates that premiums are payable "For Life." Oct. 8, 2001 Hunton Aff., at 2–3. In response, Plaintiffs allege that Friedman explained that the "For Life" provision was an option available for Plaintiffs if they wished to add value to the Policy by making premium payments beyond the "vanish date." *Id.* However, Friedman also allegedly stated that, in Plaintiffs' case, the premiums payments were governed by the Illustrations and not by the "For Life" provision. *Id.*

Plaintiffs made all premium payments set forth under the Illustrations. Plaintiffs allege that Guardian continued to request premiums after the Illustrations' premium vanish date. Plaintiffs contend that, after Plaintiffs inquired about the status of the Policy in December 1997, Guardian first informed them that premiums would be required for an additional five years beyond the vanish date. Plaintiffs further allege that in May 1998 Guardian informed them that the investment component of the Policy had not generated the returns that had been originally represented to them and that they would possibly have to pay premiums for the remainder of Hunton's life.

Guardian adds to Plaintiffs' version of the facts. Beginning in 1993, Guardian contends that it sent Annual Benefit Statements ("Statements") to Plaintiff Benny Pace, owner of the Policy, and to Friedman. The Statements provided information regarding the performance of the Policy, the amount of dividend payments made by Guardian, and the Policy's cash value. Defendant has submitted three Statements dated February 14, 1997; February 4, 1996; and February 4, 1993. *See* Exhibit B to Ciotti Aff. [Doc. # 26] ("Statements").[11]

---

9. Friedman's testimony also contradicted this contention. Friedman testified that he informed Hunton during the negotiations regarding the Policy that the Illustrations were not guaranteed and were not part of the Policy, and that a decrease in dividend payments could extend the years that the Trust would have to pay premiums. Friedman Dep., at 68–71. Nevertheless, Friedman acknowledges that he did not tell Hunton that a decrease in dividend payments could require that the Trust pay premiums for life. Friedman Dep., at 71–72. Friedman also testified that he assured Hunton that the premium payments would vanish because of Guardian's dividend stabilization fund. *Id.*

10. Hunton alleges that he relied on the advice of an accountant, Lawrence C. Bower, when deciding to purchase the Policy. Oct. 8, 2001 Hunton Aff., at 1–2. Hunton also alleges that he relied on the advice of Friedman, the Guardian agent who sold the Policy to Hunton. *Id.*

11. Ciotti, a lawyer for Guardian, affirms that Friedman produced these Statements to Guardian in the course of this litigation. Ciotti Aff., at 2. The Statements have been

Plaintiffs filed suit in the 127th Judicial District of Harris County, Texas on March 24, 2000, naming both Guardian and Friedman as Defendants. On November 17, 2000, Guardian removed to federal district court.[12] The case was remanded on January 31, 2001. Plaintiffs then voluntarily dismissed Friedman on February 16, 2001. In response, on February 22, 2001, Guardian again removed the case to this Court.

On June 29, 2001, Plaintiffs filed a Second Amended Complaint, alleging five claims: (i) breach of contract, (ii) fraud and fraudulent inducement, (iii) violations of the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA"), TEX. BUS. & COM. CODE § 17.41 *et seq.*, (iv) violations of the Texas Insurance Code, TEX. INS. CODE art. 21.21 ("Insurance Code"), and (v) negligent misrepresentation.[13]

Guardian makes several arguments in favor of its motion for summary judgment. First, Guardian argues that Plaintiffs' claims all are barred by the applicable statutes of limitations. Second, Guardian argues that Plaintiffs' breach of contract claim fails as a matter of law because it is contradicted by the express terms of the insurance contract. Third, Guardian asserts that Plaintiffs' fraud, DTPA, and Insurance Code claims fail because Plaintiffs have not alleged justifiable reliance. Finally, Guardian argues that Plaintiffs have failed to plead their fraud, DTPA, Insurance Code, and negligent misrepresentation claims with particularity as required by FED. R. CIV. P. 9(b). The parties have extensively briefed all issues in Guardian's motion for summary judgment and the motion is ripe for adjudication.

Bates numbered by counsel as "Friedman 000016–000020," and will be referred to in this Memorandum and Order as "Statements, at 16–20." It is clear that Friedman received the Statements, which are marked "Agency Copy." Statements, at 16, 19, 20. For example, the language in the Statements addresses the owner of the Policy: "The Annual Benefit Statement gives *you* an important summary of *your* policy's current cash value and total death benefit protection." *Id.* at 16 (emphasis added).

The Statements contained information which, if properly reviewed and compared to the information contained in the Illustrations, would have informed Plaintiffs that the Policy was not performing as well as projected in the Illustrations. For example, in February 1996, at the end of the fourth year under the Policy, the net cash value of the Policy as reported by the Statements was $183,438.33 while the net cash value projected by the Illustrations was $191,441. Statements, at 19; Illustrations, at 1 of 6. Also in 1996, the current dividends paid to the Policy were reported to be $6,830.30 in the Statements but were projected to be $8,907 in the Illustrations. Statements, at 19; Illustrations, at 1 of 6. Plaintiffs do not expressly dispute receiving the Statements. Instead, Hunton contends that "Guardian did not provide or otherwise

offer any information which would lead [Plaintiffs] to believe that the Trust would owe any premiums other than those agreed to in the Premium Payment Schedule." Oct. 8, 2001 Hunton Aff., at 3.

Guardian also contends that Friedman informed Plaintiffs on several occasions during 1994–1996 that the Policy was not performing according to the Illustrations. Friedman Dep., at 75–78, 103–110, 129–130. Furthermore, Friedman testified that he provided Hunton with updated illustrations that indicated that additional premiums would have to be paid beyond the originally projected vanish date. *Id.* The Court does not rely in its analysis on these contested matters.

**12.** Guardian claimed that Friedman had been fraudulently joined as a defendant to defeat diversity jurisdiction. Plaintiffs allege that they are both Texas citizens. Friedman is also a Texas citizen. Guardian is a New York corporation, with New York City as its principal place of business.

**13.** Plaintiffs have moved for leave to amend their complaint to add additional contract claims and a separate claim for promissory estoppel. These claims are discussed in the section of this Memorandum and Order, at pages 42–48

## II. SUMMARY JUDGMENT STANDARDS

A defendant's motion for summary judgment is properly granted unless there is evidence "on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wheeler v. Miller,* 168 F.3d 241, 247 (5th Cir.1999). Rule 56 is an integral part of the Federal Rules of Civil Procedure, recognizing a party's right to demonstrate that certain claims have no factual basis and to have those unsupported claims disposed of prior to trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the movant shows that there are no genuine issues of material fact, the burden is on the nonmovant to demonstrate with "significant probative evidence" that there is an issue of material fact warranting a trial. *Texas Manufactured Housing Ass'n v. Nederland,* 101 F.3d 1095, 1099 (5th Cir.1996), *cert. denied,* 521 U.S. 1112, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Doe v. Dallas Independent School Dist.,* 153 F.3d 211, 215 (5th Cir. 1998); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc* ).

The Court "must review all of the evidence in the record, but make no credibility determinations or weigh any evidence." *Peel & Company, Inc. v. The Rug Market,* 238 F.3d 391, 394 (5th Cir.2001) (citing *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105, (2000)). "In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached." *Id.*

"Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial and continuing the action would be useless." *Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 192 (5th Cir.1991). Rumors, speculation, hearsay and other information which would be excluded at trial cannot be considered in ruling on a motion for summary judgment. *Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir.1995).

## III. LIMITATIONS PERIODS FOR PLAINTIFFS' CLAIMS

Guardian argues that all of Plaintiffs' claims are barred by the applicable two or four year statutes of limitations.[14] First, Guardian asserts that all Plaintiffs' claims accrued when Guardian issued the Policy in 1992. Thus, Guardian contends the limitations periods ran on Plaintiffs' claims in

---

**14.** Under Texas law, the statute of limitations for breach of contract claims is four years. TEX. CIV. PRAC. & REM. CODE § 16.004(a)(3) (Vernon Supp.2001); *Morriss v. Enron Oil & Gas Co.,* 948 S.W.2d 858, 869 (Tex.App.-San Antonio 1997, no writ). The statute of limitations for fraud is also four years. TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4) (Vernon Supp.2001); *Williams v. Khalaf,* 802 S.W.2d 651, 656–57 (Tex.1990); *see Martinez Tapia v. Chase Man-* *hattan Bank, N.A.,* 149 F.3d 404, 410–11 (5th Cir.1998). Plaintiffs' other claims all have two year limitations periods. *See* TEX BUS. & COM CODE § 17.565 (Vernon 1987) (two year period for DTPA claims); TEX INS. CODE art. 21.21, § 16(d) (Vernon Supp.2001) (two year period for Insurance Code claims); *Kansa Reins. Co., Ltd. v. Congressional Mortgage Corp.,* 20 F.3d 1362, 1369 (5th Cir.1994) (two year period for negligent misrepresentation).

either 1994 or 1996. Alternatively, Guardian argues that the discovery rule is inapplicable to Plaintiffs' claims because Plaintiffs have failed to raise a genuine issue of fact that the alleged misrepresentations could not have been discovered through the exercise of reasonable diligence. Finally, Guardian asserts that, in any event, the two year limitations period for the DTPA, Insurance Code, and negligent misrepresentation claims expired prior to Plaintiffs filing suit in March 2000, since Plaintiffs allegedly have admitted that in December 1997 they became aware of Guardian's alleged misrepresentations on which these claims are founded.

In response, Plaintiffs argue that their causes of action did not accrue until they began to pay premiums after the vanish date in the Illustrations, which occurred in mid–1999. Plaintiffs rely on several Texas decisions to contend that a cause of action does not accrue until damages are sustained. Plaintiffs characterize their damages as being the premium payments made after the alleged vanish date. In its Reply, Guardian challenges this characterization. First, Guardian argues that the damage Plaintiffs sustained is the purchase of a Policy they would not have wanted but for Guardian's alleged misrepresentation. Thus, Guardian asserts, the limitations period for Plaintiffs began when the Policy was issued. Second, Guardian argues that, under Texas statutory law, the limitations period for the DTPA and Insurance Code claims begins to run when the alleged misrepresentation is made.

After considering the parties' arguments and the relevant law, the Court holds that the applicable statutes of limitations bar all claims that Plaintiffs allege in their Second Amended Complaint [Doc. # 11].[15]

## A. Fraud and Fraudulent Inducement Claims

Plaintiffs' fraud claim is barred by the statute of limitations. Plaintiffs have not adduced evidence that shows that they exercised reasonable diligence in reviewing Guardian's Policy.

---

**15.** Plaintiffs' positions vary in their submissions to the Court. At some points, Plaintiffs argue that premium payments were tied to dividends and that dividends were guaranteed as indicated by the Illustrations because of Guardian's "dividend stabilization fund." Oct. 18, 2001 Hunton Aff., at 2 ("Guardian explained that the Premium Schedule [in the Illustrations] would be met because Guardian enjoyed the benefits of the Dividend Stabilization Fund, which would compensate for or supplement any potential fluctuations in dividends, and in that way, the Dividend Stabilization Fund ensured that the Premium Schedule would be met."). At other points, Plaintiffs argue simply that premium payments made according to the Illustrations were sufficient to pay for the insurance for the remainder of Hunton's life. *Id.* ("Guardian [represented] that the [Illustrations] included in the policy wallet controlled and governed the payment of premiums."). The distinction between these arguments are not material because, as discussed below, both versions of Plaintiffs' arguments are flatly contradicted by the documents relating to the Policy that Plaintiffs completed and received. For instance, as to Plaintiffs' first version, Plaintiffs indicated on the Application that they intended for dividends to be used to purchase "One year term insurance not to exceed Target Face Amount of $ 905,450." Application, at 2. Plaintiffs *did not* choose to apply the dividend payments to premiums, which was another option on the Application form. *Id.* (the option stated: "Vanish Premium-available only if a PUA rider is requested. Premiums to be vanished at the end of the first policy year by use of PUA rider additions and future dividends."). All subsequent Annual Statements submitted to the Court reveal that dividends were being applied to the purchase of one year term insurance, not toward premium payments on the underlying $1 million Policy. Statements, at 18–20 ("Your dividend option is: one year term insurance with target face amount.").

In Texas, the general rule is that a cause of action accrues and the statute of limitations begins to run when "a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all the resulting damages have not yet occurred." *Murphy v. Campbell*, 964 S.W.2d 265, 270 (Tex.1997); *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex.1996); *Roberts v. Lain*, 32 S.W.3d 264, 269 (Tex.App.-San Antonio 2000, no pet). Thus, an action for fraud accrues when the fraud is perpetrated. *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex.1988); *Lawrence v. Lawrence*, 911 S.W.2d 443, 448 (Tex. App.-Texarkana 1995, writ denied); *accord Jackson v. Speer*, 974 F.2d 676, 679–80 (5th Cir.1992); *Porter v. Charter Medical Corp.*, 957 F.Supp. 1427, 1434 (N.D.Tex. 1997).

If the fraud is concealed from the plaintiff, however, the limitations period does not run until plaintiff discovers the fraud or should have discovered the fraud through the exercise of reasonable diligence. *Woods*, 769 S.W.2d at 517; *Lawrence*, 911 S.W.2d at 448; *Jackson*, 974 F.2d at 679–80; *Porter*, 957 F.Supp. at 1434. In this situation, Texas courts apply the discovery rule or the fraudulent concealment doctrine as exceptions to the statute of limitations.[16] *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex.1996); *Computer Assoc. Int'l v. Altai, Inc.*, 918 S.W.2d 453, 455–56 (Tex.1996).

The discovery rule is a "very limited exception to statutes of limitation" and only applies when (i) the nature of the injury incurred is "inherently undiscoverable" and (ii) the evidence of the injury is "objectively verifiable." *Computer Assoc.*, 918 S.W.2d at 456; *In re Coastal Plains, Inc.*, 179 F.3d 197, 214 (5th Cir.1999); *Prieto v. John Hancock Mutual Life Ins. Co.*, 132 F.Supp.2d 506, 513 (N.D.Tex. 2001). The "inherently undiscoverable" requirement is met when the injured party is unlikely to discover the injury during the limitations period despite due diligence. *S.V.*, 933 S.W.2d at 7; *Computer Assoc.*, 918 S.W.2d at 456; *Coastal Plains*, 179 F.3d at 215. The injury does not have to be impossible to discover, but a party's mere failure to discover the injury is not sufficient to meet the requirement. *S.V.*, 933 S.W.2d at 7; *Coastal Plains*, 179 F.3d at 215. To be inherently undiscoverable the wrong and the injury "must be unknown to the plaintiff because of their very nature and not because of any fault of the plaintiff." *Coastal Plains*, 179 F.3d at 214–15. The requirement of "objective verifiability" requires physical or other evidence, such as an objective eyewitness account, to corroborate the existence of the claim. *Id.* "An injury is 'objectively verifiable' if the presence of the injury and the producing wrongful act cannot be disputed." *Howard v. Fiesta Texas Show Park,*

---

**16.** There is some confusion among courts as to whether the discovery rule and the fraudulent concealment doctrine (i) toll the limitation period after the claim has accrued or (ii) delay the accrual of the claim. *Compare S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex.1996), *and Computer Assoc. v. Altai*, 918 S.W.2d 453, 455–56 (cause of action for fraud does not accrue until the fraud is discovered or should have been discovered by plaintiff), *with Velsicol Chem. Corp. v. Winograd*, 956 S.W.2d 529, 531 (Tex.1997) ("As with the discovery rule, [the fraudulent concealment] doctrine tolls the statute until the fraud is discovered or could have been discovered with reasonable diligence."), *and Prieto v. John Hancock Mutual Life Ins. Co.*, 132 F.Supp.2d 506, 513 (N.D.Tex.2001) (treating the fraudulent concealment doctrine and the discovery rule as tolling doctrines in vanishing premium life insurance policy case). One court has noted this confusion and suggests that, as a practical matter, the distinction does not alter the burden on plaintiff to meet the requirements of the doctrine; and may not alter the outcome. *Porter v. Charter Medical Corporation*, 957 F.Supp. 1427, 1434 n. 4 (N.D.Tex.1997).

*Inc.*, 980 S.W.2d 716, 720 (Tex.App.-San Antonio 1998, pet. denied).[17]

■■ Similarly, the doctrine of fraudulent concealment[18] delays application of the statute of limitations. When the fraud is concealed, the doctrine tolls the limitations period "until the fraud is discovered or could have been discovered with reasonable diligence." *Velsicol*, 956 S.W.2d at 531; *Prieto*, 132 F.Supp.2d at 515. The doctrine "estops the defendant from relying on the statute of limitations as an affirmative defense to plaintiff's claim." *Computer Assoc. Int'l*, 918 S.W.2d at 456.

■ Plaintiffs do not raise a genuine issue of fact as to whether Guardian's al-

leged misrepresentations are inherently undiscoverable. Plaintiffs contend that Friedman guaranteed that the Trust would not have to pay premiums beyond the "vanish date." Plaintiffs further allege that the Policy provisions that required premium payments "For Life" do not control the Trust's payments of premiums under the Illustrations.[19] Nevertheless, even a cursory review of the Policy and Application informs Plaintiffs that Friedman's oral representations did not accurately reflect the written Policy. The Policy terms thus are easily discoverable. Indeed, the Application, signed by Hunton before he received the Policy, provides explicitly that Friedman lacked the authority to alter *any* of the written provisions of the Application or the Policy.[20] Applica-

17. Texas courts generally require that plaintiff must produce "direct, physical evidence" to support the "facts upon which liability [is] asserted." *S.V. v. R.V.*, 933 S.W.2d at 7. An often-cited example of an injury that is "objectively verifiable" is, in the context of a medical malpractice suit, a sponge accidentally left in a patient's body. *Id.; Computer Assoc.*, 918 S.W.2d at 457–58. One court has interpreted the "objective verifiability" prong as requiring a higher evidentiary standard that the ordinary preponderance of the evidence standard. *Prieto*, 132 F.Supp.2d at 514.

18. Neither Plaintiffs nor Guardian explicitly mentions fraudulent concealment, but nearly all the cases that address the discovery rule also discuss the fraudulent concealment doctrine. Plaintiffs cannot meet the requirements of either doctrine as explained below in the text of this decision.

19. Plaintiffs also contend that the discovery rule applies to toll the statute of limitations because they did not learn that the Policy was not performing as projected in the Illustrations until they inquired in December 1997. Plaintiffs deny that Guardian provided them with any information before 1997 that should be deemed sufficient to have alerted them that they might have to pay premiums beyond the vanish date in the Illustrations. Examining the record in the light most favorable to Plaintiffs and disregarding any controverted evidence produced by Guardian, the Court concludes that Plaintiffs have failed to meet

their burden under the discovery rule. Plaintiffs have not produced evidence that the misrepresentation was "inherently undiscoverable" or that Plaintiffs exercised "reasonable diligence." First, the language of the Policy and the Illustrations themselves placed Plaintiffs on notice that the premium payment schedule in the Illustrations was not guaranteed. Second, Plaintiffs were free at any time to contact Guardian directly regarding the status of the Policy before 1997. Last, and most importantly, Guardian has submitted copies of the Statements produced in discovery by Hunton that reveal Plaintiff Pace was sent annual status reports on the dividends being earned by the Policy and that showed Guardian's dividends were below the projections in the Illustrations. Plaintiffs cannot rely on the Illustrations as creating a binding payment schedule but then ignore the rest of the data on the *same* page that lists the dividend projections. Once the actual dividends as listed in annual status reports deviated from the projected dividends in the Illustrations, and the net value of the Policy dropped below projections on the same spreadsheet, Guardian's alleged misrepresentations should have been apparent to Plaintiffs.

20. The Application states "that no information acquired by any Representative of [Guardian] shall bind [Guardian] unless it shall have been set out in writing in this Application." Application, at 4. The Application further provides that "only the President,

tion, at 4. Furthermore, the Application also states that the cash value of the Policy "may increase or decrease based on the investment experience of the separate account and are not guaranteed." *Id.* at 3. The Policy itself, which Hunton reviewed closely with Friedman, clearly states under the section heading "dividends" that the "policy's share [of the dividends], if any, is determined yearly by Guardian," and "[t]he dividend will reflect Guardian's

mortality, expense, and investment experience." [21] Finally, neither the Policy nor Application mention the Illustrations as being part of the contract.[22]

Thus, a review of the Policy establishes that (i) the dividends will depend on various factors and are not guaranteed, (ii) that Friedman lacked authority to make oral representations that altered the written terms of the Policy, and (iii) that mate-

a Vice President, or a Secretary of [Guardian] has the authority to bind [Guardian] by any promise or statement or to waive or modify any of [Guardian's] requirements." *Id.* The Policy itself contains a similar provision:

> Only the President, a Vice President, or the Secretary of Guardian may make or modify this policy. No agent has the authority to change this policy or to waive any of Guardian's requirements; no agent may waive an answer to any question in the application. *Guardian will not be bound by any promise or statement made by any agent or other person except as stated above.*

Policy, at 8. Plaintiffs make no contention that Friedman was an officer of Guardian.

21. Plaintiffs contend that "nothing in the Policy ties dividend performance to the premiums due under the Policy." Plaintiffs' Supplemental Response, at 2. Plaintiffs summarize the relevant issue as whether Guardian guaranteed that the premiums would be paid according to the Illustrations, regardless of dividend performance. *Id.* Plaintiffs' contention fails. Plaintiffs' unsupported conclusory allegations fly in the face of the written record. These types of self-serving and conclusory allegations are insufficient to raise a genuine question of fact in response to a summary judgment motion. The Policy terms clearly tie dividend performance to premium payments. The Policy states:

> The policy's cash value, including the cash value of any dividend additions and dividends left at interest, may be used to make the policy paid-up. Guardian will so apply the cash value if it equals the net single premium at the attained age for a paid-up policy in the same face amount as the policy.

Policy, at 6. The Policy also states that premiums are due "For Life." The cover sheet to the policy contains the statements "[p]remiums payable during insured's lifetime" and

"annual dividends payable *if earned.*" Policy, at 1 (emphasis added). On page 3 of the Policy, under the heading "policy years payable," the words "For Life" are printed. The Application provides under "Section E: Dividends," the option for Hunton to have "Premiums to be vanished at the end of the first policy year by use of PUA rider additions and future dividends." Application, at 2. The Court notes that Hunton did not select this option on the Application. *Id.* Finally, the Policy and Application state that Friedman did not have the authority to modify any of these terms. Thus, it is clear from the terms of the Policy that Plaintiffs remain responsible for premium payments for life unless and until there is adequate dividend performance.

22. The Policy states that the "entire contract consists of this policy and the attached application." Policy, at 8. The Application makes reference to "illustrations of benefits, including death benefits and cash values." Application, at 3. However, the Application expressly limits the contract to the terms "set out in writing in this Application," the Policy itself, and any required supplement to the Application. *Id.* at 4. Neither party alleges that the Illustrations are a required "supplement" to the Application. It is noted that attached to the Application is a one-page sheet titled "Amendment to Application," which contains "statements substituted for the answers to the corresponding questions in the application," but makes no reference to the Illustrations or to a guaranteed vanish date for premium payments. Furthermore, unlike the Illustrations, the amendment is stamped "File in Application." Thus, Plaintiffs have not presented admissible evidence to create a genuine fact issue that the Illustrations are part of the Policy or the Application, and thereby became part of the parties' contract.

rials other than the Application, the printed Policy form and its riders are not part of the contract. These unequivocal provisions in the Policy render the putative fraud discoverable and sufficient to put Plaintiffs on notice that Guardian's dividend payments are variable, not guaranteed, despite any contrary understanding held by Plaintiffs from Friedman's representations or alleged implications of the Illustrations.

Plaintiffs also are not entitled to rely on the discovery rule to toll the fraud limitations period because Plaintiffs did not act with reasonable diligence to discover the alleged misrepresentations. "Investment decisions inherently require that the investor exercise diligence rather than relying on any oral representations." *Prieto*, 132 F.Supp.2d at 520; *see also Martinez Tapia v. Chase Manhattan Bank*, 149 F.3d 404, 409 (5th Cir.1998) (in the context of the statute of limitations, "party claiming fraud and/or misrepresentation must exercise due diligence to discover the alleged fraud") (quoting *McGill v. Goff*, 17 F.3d 729, 733 (5th Cir.1994)). Plaintiffs, according to their own testimony, did nothing

regarding the Policy, except make payments according to the original premium schedule.[23] Plaintiffs easily could have checked with Guardian as to the actual status of dividends, accruals, and cash values on the Policy. It appears that Plaintiffs did not review the Statements that at least one of them likely received; nor did they request any information on the Policy account status. Plaintiffs failed to exercise reasonable diligence by relying solely on Friedman's oral statements regarding the Policy attributes.[24]

Plaintiffs also present, as evidence of their diligence, the fact that Hunton relied on the advice of an accountant in making the decision to purchase the Policy. This contention fails to create a genuine issue of fact regarding Plaintiffs' exercise of reasonable diligence. Plaintiffs do not explain in what manner their accountant participated in the decision to purchase the Policy, nor why an accountant's involvement is material. Therefore, the Court holds that Plaintiffs have failed to satisfy their burden to demonstrate tolling of the limitations period under the discovery rule or the fraudulent concealment doctrine.[25]

---

**23.** Plaintiffs' payment history is not totally consistent with this representation. *See infra* note 31.

**24.** Plaintiffs also assert that they relied on Friedman's representations regarding the "Dividend Stabilization Fund" when purchasing the Policy. Plaintiffs claim that Friedman informed Hunton that Guardian would use the "Dividend Stabilization Fund" to ensure that Hunton would not have to pay premiums beyond the vanish date in the Illustrations. Oct. 18, 2001 Hunton Aff., at 2. Plaintiffs' reliance is unreasonable and is contrary to the terms of Policy and Application. Neither the Policy nor Application mentions the "Dividend Stabilization Fund." Accordingly, Plaintiffs could not reasonably consider Friedman's representations regarding the "Dividend Stabilization Fund" to be part of the insurance contract. The absence from the documents of the guarantee that Plaintiffs im-

pute to Friedman renders fraud easily discoverable. Moreover, Plaintiffs lacked diligence in failing to obtain written explanation of this fund from Guardian if they were relying so heavily on it to benefit them.

**25.** The second requirement of the discovery rule, that the injury must be "objectively verifiable," also is not satisfied on this record. Plaintiffs have not alleged in their Complaint or produced any evidence that they have "physical or other evidence, such as an objective eyewitness account, to corroborate the existence of the claim." *Coastal Plains*, 179 F.3d at 215. As United States District Judge Lindsay concluded, in a case involving a similar vanishing premium policy, documentary evidence such as the Policy and the Illustrations, coupled with the plaintiff's self-serving allegations are insufficient to meet the "objectively verifiable" requirement. *Prieto*, 132 F.Supp.2d at 514–15.

Plaintiffs rely on several Texas cases for the proposition that a cause of action does not accrue until damages are sustained. *Atkins v. Crosland*, 417 S.W.2d 150, 153 (Tex.1967) (a "cause of action accrues, and the statute [of limitations] begins to run, when, and only when, the damages are sustained).[26] Plaintiffs thus argue that their fraud claim did not accrue until they began making premium payments at Guardian's demand after the alleged vanish date in mid–1999. Plaintiffs' contention fails as it is founded on a misapplication of the cited cases. *Atkins* applies only to acts that do not of themselves constitute a "legal injury." The full passage on which Plaintiffs rely reads: "if the act is of itself not unlawful, and plaintiff sues to recover damages subsequently accruing from, and consequent on, the act ..., the statute begins to run, when ... the damages are sustained." *Id.* In *Atkins*, the act was a mistake made by an accountant in preparing the plaintiff's tax records. *Id.* at 150–52. Because the accountant's mistake was not in itself unlaw-

ful, the court in *Atkins* held that plaintiff's action did not accrue until a tax deficiency was assessed against the plaintiff. *Id.* at 153. Plaintiffs' claim for fraud and fraudulent inducement at bar are entirely different. Fraud is itself an actionable legal injury. The general Texas rule is that a cause of action for fraud accrues and the limitations period "begins to run when the fraud is perpetrated, or if the fraud is concealed, from the time it is discovered or could have been discovered by the exercise of reasonable diligence." *Woods*, 769 S.W.2d at 517. *Atkins* deals only with a special exception to this rule, *Atkins* is inapplicable to this case.[27]

Furthermore, to the extent Plaintiffs assert a claim for fraud in the inducement of contract, Plaintiffs' claim is that they were defrauded into buying the particular insurance policy they did. The *Atkins* court held that when the act is a wrong in itself, the "cause of action accrues and the statute begins to run from the time the act is committed, even where little, if any, actual damage occurs immedi-

---

**26.** Plaintiffs cite *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex.1990); *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515 (Tex.1998).

**27.** Plaintiffs also contend that the cause of action for their claims did not accrue because they did not suffer a "legal injury" until they began paying premiums beyond the vanish date. In support of their argument Plaintiffs rely on a New York State Court of Appeals case involving a similar action against Guardian over a vanishing premium policy. The New York State Court of Appeals held that the plaintiff's injuries "occurred when they were first called upon to pay additional premiums beyond the date by which they were led to believe that policy dividends would be sufficient to cover all premium costs." *Gaidon v. Guardian Life Ins. Co.*, 96 N.Y.2d 201, 727 N.Y.S.2d 30, 750 N.E.2d 1078, 1083 (N.Y. 2001). This decision is authoritative only to the extent that this Court finds it to be persuasive. The Court notes that the New York Court did not apply Texas law to reach its

result. The decision in *Gaidon* also is contrary to established precedent of the Fifth Circuit. In *Martinez Tapia v. Chase Manhattan Bank*, 149 F.3d 404, 409 (5th Cir.1998), the Fifth Circuit addressed the accrual of a cause of action for misrepresentations related to the purchase of a financial instrument. The Court of Appeals held that if the financial instrument contains terms that are clearly contrary to the alleged misrepresentation, the cause of action accrues at the time the instrument is purchased. *Id.* That court reasoned further that "an investor who seeks to blame his investment loss on fraud or misrepresentation must himself exercise due diligence to learn the nature of his investment and the associated risks." *Id.; see also Prieto*, 132 F.Supp.2d at 514.

The Court also is unpersuaded by Plaintiffs' characterization of their legal injury. Plaintiffs, under their own theory, suffered a legal injury when they purchased a policy they otherwise would not have purchased but for Guardian's misrepresentations.

ately." 417 S.W.2d at 153. For the fraud in inducement claim, Plaintiffs suffered a legal injury from their reliance on Guardian and Friedman's alleged misrepresentations because Plaintiffs would not have purchased the Guardian insurance policy but for Friedman's alleged misrepresentations. Accordingly, Plaintiffs' fraud and fraudulent inducement claims are barred by the statute of limitations.

### B. *Negligent Misrepresentation Claim*

Plaintiffs' negligent misrepresentation claim is barred by the applicable two year statute of limitations. The discovery rule does not apply to negligent misrepresentations claims, and, even if the discovery rule applied, Plaintiffs had notice of Guardian's alleged misrepresentations more than two years before the filing of this action.

■■■ In Texas, negligent misrepresentation claims sound in negligence, not fraud. *Kansa Reins. Co., Ltd. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1371 (5th Cir.1994); *see also Milestone Properties, Inc. v. Federated Metals Corp.*, 867 S.W.2d 113, 119 (Tex.App.-Austin 1993, no writ); *Texas Am. Corp. v. Woodbridge Joint Venture*, 809 S.W.2d 299, 302 (Tex. App.-Fort Worth 1991, writ denied). Consequently, negligent misrepresentation claims are governed by negligence rules. *Id.* at 1372. Generally, in Texas negligence actions, the limitations period runs from "the commission of the negligent act, not the ascertainment of damages."[28] *Id.*

Thus, the limitations period on Plaintiffs' negligent misrepresentation claim began to run when the Policy was issued to Plaintiffs in 1992.

■■■ Plaintiffs' claim would also be time-barred even if the discovery rule or fraudulent concealment doctrine were applied to this negligent misrepresentation action.[29] Plaintiffs admit that, at the latest, they were on notice of Guardian's alleged misrepresentation more than two years before the filing of this action; they were notified by Guardian in December 1997 that the Trust would have to pay premiums after the alleged vanish date. Thus, Plaintiffs' negligent misrepresentation claim is time-barred.

### C. *Insurance Code and DTPA Claims*

■■■ Plaintiffs also asserted DTPA and Insurance Code claims. These claims are subject to the two year limitations period that commences at the time the misrepresentation is made or after the plaintiff "discovered or in the exercise of reasonable diligence should have discovered the occurrence of the [unlawful act]." TEX. BUS. & COM. CODE § 17.565 (Vernon 1987); TEX. INS. CODE art. 21.21, § 16(d) (Vernon Supp.2001); *Gilbreath v. White*, 903 S.W.2d 851, 855 (Tex.App.-Texarkana 1995, no writ) (statute of limitations begins to run for DTPA and Insurance Code claims when the deceptive act occurred or when the plaintiff should have discovered the deceptive act with reasonable dili-

---

28. Traditionally, Texas courts have applied the discovery rule to negligence actions only in extremely rare and unusual circumstances. *E.g., Gaddis v. Smith*, 417 S.W.2d 577, 580–81 (Tex.1967) (applying discovery rule in medical malpractice claim in which surgeon left a foreign object in patient's body). The Fifth Circuit held, based on the weight of Texas authority at the time the issue was presented in 1994, that the discovery rule does not apply to cases of negligent misrepresentation. *Kan-*

*sa Reins. Co., Ltd. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1372–73 (5th Cir.1994).

29. The Court is aware of recent Texas intermediate appellate court decisions that apply the discovery rule to negligent misrepresentation actions. *Matthiessen v. Schaefer*, 27 S.W.3d 25, 31 (Tex.App.-San Antonio 2000, pet. denied); *Hendricks v. Thornton*, 973 S.W.2d 348, 365 (Tex.App.-Beamont 1998, pet. denied).

gence); *Holmes v. PT Pipe & Tubing, Inc.*, 856 S.W.2d 530, 537 (Tex.App.-Houston 1993, no writ) (holding that, for DTPA claims, the statute of limitations runs from the time the deceptive act occurred or when the consumer should have learned of the deceptive act with reasonable diligence, not when the consumer incurs damages from the deceptive act). Since the alleged misrepresentations were all made in connection with Plaintiffs' decision to purchase the Policy in 1992, the DTPA and Insurance Code claims are barred by the statute of limitations unless the discovery rule applies.

The discovery rule expressed in these statutes and interpretive case law does not assist Plaintiffs. As discussed above, Plaintiffs failed to exercise reasonable diligence to discover the alleged falsity of the statements by reviewing the written Policy.[30]

■ Even if the discovery rule were to apply, Plaintiffs' DTPA and Insurance Code claims are time barred under the two year limitations period. Plaintiffs concede in their Complaint that they were informed by Guardian in December 1997 that they would be required to make premium payments for at least five years after the vanish date. Therefore, Plaintiffs were on notice of Guardian's alleged misrepresentations concerning the Policy premiums well more than two years before Plaintiffs commenced this action. Accordingly, Plaintiffs' DTPA and Insurance Code claims are barred by the statute of limitations.

#### D. *Breach of Contract Claims*

■ In Texas, the general rule is that a cause of action for breach of contract accrues at the time the contract is breached. *Houston Endowment, Inc. v. Atlantic Richfield Co.*, 972 S.W.2d 156, 159 (Tex.

App.-Houston [14th Dist.] 1998, no pet.); *Heron Financial Corp. v. United States Testing Company, Inc.*, 926 S.W.2d 329, 331 (Tex.App.-Austin 1996, writ denied); *Harrison v. Bass Enterprises Production Co.*, 888 S.W.2d 532, 537 (Tex.App.-Corpus Christi 1994, no writ). If the breach is concealed from the plaintiff, Texas courts apply the discovery rule "until the plaintiff discovers or should have discovered the nature of the injury." *Houston Endowment, Inc.*, 972 S.W.2d at 159.

If the basic Texas rule is applied, Plaintiffs' breach of contract claims are time-barred. The breach occurred in 1992 when the Policy was issued without a provision restricting premium payments to eight years, in that premiums specified in the Policy did not adopt expressly the amounts set forth on the Illustrations. Plaintiffs, in response, contend that Guardian did not breach the insurance contract until it charged premiums beyond the vanish date set forth in the Illustrations. In the alternative, Plaintiffs contend that their cause of action accrued when Guardian gave them notice of its intention to charge additional premiums in 1997, three years before Plaintiffs originally filed this action in 2000. Plaintiffs' arguments each fail.

■ Plaintiffs contend, first and foremost, that the Illustrations were part of their insurance contract and that, under the Illustrations, premium payments were only required for seven and a half years. The Illustrations, however, contained more than a description of premium payments: the Illustrations also contained year-by-year projections of the dividends the Policy was to earn, the Policy's projected "net cash value," the Policy's "guaranteed cash values," and the amount of the death benefit. If the Court were to

---

**30.** Moreover, these alleged violations were not inherently undiscoverable.

accept Plaintiffs' position that the Illustrations were part of the parties' binding insurance contract, then Guardian would have been required to perform each year exactly according to the Illustrations. However, as shown in the Annual Benefit Statement dated February 4, 1996, the Policy was not performing according to the terms of the Illustrations.[31] Thus, under Plaintiffs' own theory, Guardian breached the parties' contract when Guardian did not pay and give Plaintiffs credit for dividends exactly as provided in the Illustrations. According to the Statements, this breach occurred more than four years before Plaintiffs brought this action on March 24, 2000.

■ Plaintiffs also appear to rely on the discovery rule to toll the limitations period on their contract claims. As discussed above, Plaintiffs fail to present evidence to raise a triable issue of fact that the discovery rule should apply to their contract claims. Plaintiffs' conclusory assertion that "Guardian did not provide or otherwise offer any information which would lead [Plaintiffs] to believe that

[Plaintiffs] would owe any premiums other than those agreed to in the [Illustrations]" (Oct. 18, 2001 Hunton Aff., at 2) ignores the Statements directed to Pace (the Policy owner) and to Friedman.[32] Moreover, this argument ignores the common sense practice of an insurance policy owner checking periodically on the status of his policy account if he intends to rely on dividend accrual to pay premiums for the policy. The Court is not obligated in a summary judgment analysis to give weight to the non-movant's conclusory, unsubstantiated assertions that contradict admissible evidence.[33] As discussed above, Plaintiffs have not presented evidence that shows that the fact that the Policy was not performing according to projections in the Illustrations was inherently undiscoverable. Furthermore, the Plaintiffs have adduced nothing to show that they acted with reasonable diligence in monitoring the performance of the Policy.[34] Accordingly, Plaintiffs' contract claims are barred by Texas's four year statute of limitations.

Because the parties have extensively briefed the merits of the breach of con-

31. The February 1996 Statement listed the dividend paid as $6,830.30 while the Illustrations projected the dividends to be $8,907. Statements, at 19; Illustrations, at 1 of 6. Also, the net cash value on the 1996 Statement was $183,438.33, not $191,441, as projected in the Illustrations. *Id.*

 The Court must accept as true Hunton's averment that he did not receive any "annual benefit statements." However, it is noted that Plaintiffs have not submitted any affidavit or evidence from Benny Pace, the owner and addressee for the insured listed on the 1993, 1996 and 1997 Statements in the record. Moreover, Plaintiffs paid monthly the exact amount reflected on Guardian's Annual Statements ($2,809.31), although that figure does not appear on the Illustrations or the Policy. Plaintiffs' payments indicate that one or more of the Plaintiffs may have seen the Statements, if not documents similar to them.

32. *See supra* note 31.

33. The Fifth Circuit has regularly held that a "summary assertion made in an affidavit is simply not enough evidence to raise a genuine issue of material fact." *Melton v. Teachers Ins. & Annuity Assoc. of America*, 114 F.3d 557, 559 (5th Cir.1997); *see also Hibernia Nat'l Bank v. Carner*, 997 F.2d 94, 98 (5th Cir.1993) ("[A]ffidavits setting forth ultimate or conclusory facts are insufficient to either support or defeat a motion for summary judgment") (internal quotations omitted); *Lechuga v. Southern Pacific Transp. Co.*, 949 F.2d 790, 798 (5th Cir.1992) ("Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment.").

34. Indeed, by Plaintiffs' own admission, they did not inquire as to the status of the Policy until 1997, five years after it was issued.

tract issues and because the issue of the statute of limitations may not be free from doubt on these claims, the interèst of justice dictates that the Court address the merits of the contract claims.

## IV. PLAINTIFFS' CONTRACT CLAIMS

 Under Texas law, the meaning of an insurance contract is to be determined under the standards applicable to contracts generally. *See Mid–Continent Cas. Co. v. Swift Energy Co.,* 206 F.3d 487, 491 (5th Cir.2000); *Cicciarella v. Amica Mutual Insurance Co.,* 66 F.3d 764, 767–68 (5th Cir.1995); *Barnett v. Aetna Life Insurance Co.,* 723 S.W.2d 663, 665 (Tex. 1987). A court's primary concern is to give effect to the intention of the parties as expressed by the policy language. *Cicciarella,* 66 F.3d at 768; *Ideal Lease Service, Inc. v. Amoco Production Co.,* 662 S.W.2d 951, 953 (Tex.1983). "When the terms of an insurance policy are unambiguous, a court may not vary those terms." *Amica Mut. Ins. Co. v. Moak,* 55 F.3d 1093, 1095 (5th Cir.1995); *see also Royal Indem. Co. v. Marshall,* 388 S.W.2d 176, 181 (Tex.1965).

Guardian contends that Plaintiffs had a duty to read the insurance contract and are bound by all of its "clear and unambiguous" terms regardless of whether Plaintiffs received an adequate explanation of them. Second, Guardian argues that Plaintiffs' contract claims are barred by the Parol Evidence Rule. In this regard, Guardian further contends that the Policy contains a merger clause and the Illustrations and Friedman's alleged oral misrepresentations are extrinsic evidence that may not be considered when the Court examines the Policy. Third, Guardian asserts that the Statute of Frauds prevents Plaintiffs from including any of Friedman's

oral statements to be part of the contract. Finally, Guardian relies on decisions in other jurisdictions addressing vanishing premium policies to support the foregoing arguments.

Plaintiffs respond with several arguments. First, Plaintiffs contend that the Policy and Illustrations must be read together because they both relate to same transaction and were executed at the same time. Next, Plaintiffs assert that the Illustrations represent a modification of the Policy that was ratified by Guardian when it accepted premium payments under the terms of the Illustrations and not the terms of the Policy. Third, Plaintiffs argue that the terms of the Policy are ambiguous and that extraneous evidence should be introduced to clarify the Policy's terms. Finally, Plaintiffs contend that the Policy should be reformed to include the Illustrations.

### A. Plaintiffs' Duty to Read the Policy

 In Texas, an insured has a duty to read the insurance policy and is charged with knowledge of its provisions. *Ruiz v. Government Employees Ins. Co.,* 4 S.W.3d 838, 841 (Tex.App.-El Paso 1999, n.p.h.); *Pankow v. Colonial Life Ins.,* 932 S.W.2d 271, 277 (Tex.App.-Amarillo 1996, writ denied); *Amarco Petroleum, Inc. v. Texas Pacific Indemnity Co.,* 889 S.W.2d 695, 699 (Tex.App.-Houston [14th Dist.] 1994, writ denied). Accordingly, the Court deems Plaintiffs to have been on notice of all the terms of the Policy.[35] As discussed above, the Policy contains explicit language that the dividends depend on various factors and are not guaranteed, that an insurance agent such as Friedman lacks authority to make oral representations that altered the written terms of the Policy, that provisions outside the Policy, its

---

**35.** If Plaintiffs did not understand the mechanics of the Policy and Plaintiffs' premium obligations, Plaintiffs should have obtained further information in writing.

riders and the Application are not part of the parties' contract, and that the premium payments are due under the Policy "For Life." The Policy also indicates that premium payments may be satisfied through dividends to the extent Guardian pays dividends. Under basic Texas law, therefore, Friedman's oral representations cannot as a matter of law override the written contract terms.

### B. *The Policy is Not Ambiguous*

The determination of whether a contract term is ambiguous is a question of law. *Cicciarella*, 66 F.3d at 768; *Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 917 (Tex.App.-Fort Worth 1988, writ denied). A contract is ambiguous only "when its meaning is uncertain and doubtful or it is reasonably susceptible of more than one meaning." *Cicciarella*, 66 F.3d at 768 (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983)).

Determining whether ambiguity exists, the court must look at the contract as a whole in light of the circumstances existing at the time of execution. *Exxon Corp. v. West Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex.1993). However, "the language should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated." *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex.1987).

A contract is not ambiguous if its terms can be given a definite or certain legal meaning. *National Union Fire Ins. Co. v. CBI Industries*, 907 S.W.2d 517, 520 (Tex.1995). Conversely, if a contract is subject to more than one reasonable interpretation, courts must adopt the construction most favorable to the non-drafting party. *State Farm Fire and Casualty Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tex. 1998).

The Policy is not ambiguous because all of its terms have a definite legal meaning. First, the Policy states clearly that premiums are payable "For Life" unless and until dividend performance is sufficient to cover the premium payments.[36] Second, the Policy states unambiguously that its terms are limited to those contained in the Policy form and its riders, and the Application. Policy, at 11; Application, at 4. Third, the Policy is clear that Friedman, a mere insurance agent, did not have the authority to alter its terms. Policy, at 11; Application, at 4.

Plaintiffs contend that this Court may properly consider extrinsic evidence in determining whether the language of the Policy is ambiguous.[37] Plaintiffs rely on a decision of the Supreme Court of Texas to support their argument. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). *Sun Oil* does not support Plaintiffs'

---

**36.** The Policy contains language that indicates that dividends, if sufficient, may be used to pay future premiums. Policy, at 6. However, nothing in the Policy guarantees that dividends will be paid at all or in sufficient sums to cover the premiums. *Id.* To the contrary, the Policy states in several places that dividends are "payable if earned" and that dividends will "reflect Guardian's mortality, expense, and investment experience." *Id.* at 1, 6. *See also id.* at 4AQ ("The values shown are computed on the assumption that all premiums to the end of the policy years shown have been paid, that there are no loans, and that

dividends are sufficient to cover the cost of one year term insurance.")

**37.** Plaintiffs offer Friedman's oral representations and the Illustrations as evidence that the Policy's terms are ambiguous. Oct. 8, 2001 Hunton Aff., at 2–3. Plaintiffs contend that Friedman reviewed the Policy with Hunton upon its delivery to Hunton. *Id.* During this conversation, Friedman told Hunton that the premiums would not be due "For Life" as stated in the Policy, but would be due under the terms of the Illustrations. *Id.*

contention. Indeed, the Supreme Court of Texas in *Sun Oil* held that "parol evidence is not admissible to render a contract ambiguous, which on its face, is capable of being given a definite meaning." *Id.* at 732. The Court holds that the terms of the Policy are clear and unambiguous on their face. Accordingly, Plaintiffs may not rely on extrinsic parol evidence to alter the unambiguous terms of the parties' written agreement.

## C. *Plaintiffs' Extrinsic Evidence*

 The parol evidence rule precludes consideration of extrinsic evidence to contradict, vary or add to the terms of an unambiguous written agreement absent fraud, accident or mistake. *In re H.E. Butt Grocery Co.*, 17 S.W.3d 360, 370 (Tex. App.-Houston [14th Dist.] 2000, no pet.). Parol evidence is not admissible for the purpose of creating an ambiguity. *Licata v. Licata*, 11 S.W.3d 269, 277 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument. *CBI Industries*, 907 S.W.2d at 520 (citing *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732 (Tex.1981)); *Constitution State Ins. Co. v. Iso-Tex Inc.*, 61 F.3d 405, 408 (5th Cir.1995). The

Court, as noted above, concludes that the Policy (with its riders and the Application) is unambiguous. Accordingly, the Court will not consider Plaintiffs' proffered evidence, such as the Illustrations or Friedman's and Hunton's testimony, in interpreting the Policy terms.[38]

Under the Policy, Plaintiffs are to make premium payments "For Life" unless and until dividend performance is sufficient to cover the premium payments. Under the Policy, the payment of dividends has been left to the discretion of Guardian based upon its "mortality, expense, and investment experience." Policy, at 6. Dividend payments have not ever been guaranteed by the Policy. *See id.* at 1, 6.

 Plaintiffs claim that Guardian breached the insurance contract when it required premium payments after the vanish date in the Illustrations.[39] However, as explained above, Plaintiffs have failed to demonstrate, or raise a genuine fact issue, that the Illustrations are part of the Policy or the parties' contract, that the Policy provision that premiums were due "for life" was not binding on Plaintiffs, or that Guardian guaranteed as part of its contract with Plaintiffs that premium payments would vanish. Accordingly, Plaintiffs have failed to state a claim for breach of contract.[40]

---

**38.** As discussed in note 24 *supra,* the representations made by Friedman regarding the "Dividend Stabilization Fund" are not part of the insurance contract. Nowhere does the Policy or the Application mention the "Dividend Stabilization Fund." Thus, the Court will not consider this evidence when analyzing Plaintiffs' breach of contract claims.

**39.** In 1998, Guardian reported to Plaintiffs that the Policy has not performed as well as had been projected and that Plaintiffs would be required to make dividend payments for the remainder of Hunton's life.

**40.** Plaintiffs have introduced Guardian's Annual Report for 2000 and an Internet printout

of the S & P 500 and Dow Jones Industrial Averages from February 1992 to June 1999. *See* Exhibits C and D to Plaintiffs' Supplemental Response. Based on these materials, Plaintiffs suggest that Guardian has had a positive investment experience and thus should have paid dividends on the Policy. This contention fails. The decision of a corporation to declare dividends is complex, based on many factors, and subject to business judgment the courts generally do not second-guess. In any event, the Dow Jones and S & P 500 indices are not probative of a single company's (Guardian's) financial performance. Plaintiffs have submitted nothing to create a triable issue of fact that Guardian acted in bad faith in determining that its

### D. *Plaintiffs' Additional Contract Arguments*

Plaintiffs present several arguments in the alternative, in the event that the Court finds the Illustrations are not part of the Policy. These arguments are not persuasive.

### 1. Several Documents To Be Read Together

 First, Plaintiffs argue that the Policy and Illustrations should be read together as one contract because they necessarily relate to the same transaction. Plaintiffs assert that the Illustrations were included in the same folder as the original Policy Guardian delivered to Plaintiffs, and that Friedman had used the Illustrations when selling and explaining the Policy. Plaintiffs rely on several Texas cases in support of their contention. *See Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex.1968); *Libby v. Noel*, 581 S.W.2d 761, 764 (Tex. Civ.App.-El Paso 1979, no writ); *Texas State Bank of Austin v. Sharp*, 506 S.W.2d 761, 763 (Tex.Civ.App.-Austin 1974, ref'd n.r.e.). Plaintiffs' reliance on these cases is unfounded.

In *Owen*, the Texas Supreme Court stated the general rule that an unsigned document may be incorporated by reference to a signed agreement if the signed agreement "plainly refers to another writing." *Owen*, 433 S.W.2d at 166. The Supreme Court of Texas expressly declined to extend this doctrine to a situation in which the two documents make no internal references to each other. *Id.* at 166–67. Instead, the Court held that "[t]he only permissible extension 'of the doctrine requiring an express reference in the signed paper is where the signed paper at the time of the signature can be shown *from its contents* to be based on an adoption of a then existing unsigned paper.'" *Id.* at 167 (emphasis added). In this case, the Illustrations were not signed. The Policy does not expressly incorporate or make any reference to the Illustrations.[41] Nor is there anything in the Policy that shows the Policy is based on or adopts the Illustrations. To the contrary, the Policy's merger clause expressly states that the parties' contract included only the terms contained in the Policy and Application. Thus, *Owen* is inapplicable to this case.

*Texas State Bank* and *Libby* are similarly inapposite. In *Texas State Bank*, the issue was whether the payment of a promissory note was contingent upon the satisfaction of conditions precedent in a separately-executed sales agreement. The Austin Court of Appeals held in 1994 that the note and the agreement must be read together to determine whether the obligor of the note had a duty to perform: "[I]t is settled in Texas that where two or more instruments, executed contemporaneously or at different times, pertain to the same transaction, the instruments will be read together even though they do not expressly refer to each other." *Texas State Bank*, 506 S.W.2d at 763. In *Libby*, the El Paso Court of Appeals held in 1979 that a pur-

---

dividends would be insufficient to make the Plaintiffs premium payments vanish.

**41.** The Application, which is part of the Policy, states: "Upon request we will furnish illustrations of benefits, including death benefits and cash values, for (a) the Variable Life Insurance Policy applied for, and (b) a fixed benefit life insurance policy for the same premium." Application, at 3. However, the Application also states that "[i]t is understood that under the Variable Life Insurance Policy the amount of ... the cash value may increase or decrease based on the investment experience of the separate account and are not guaranteed." *Id.* These statements do not expressly incorporate the Illustrations into the Policy. Moreover, if anything, this offer by Guardian emphasizes that the company's investment experience may vary from any illustrations it may issue, and dividends cannot be guaranteed.

chase agreement and promissory note—each executed by one or both parties—can be construed together for the purposes of an action for specific performance, if the two documents make reference to the subject matter of the transaction, were both executed, and one document describes the other in detail. *Libby*, 581 S.W.2d at 764. In the instant case, in contrast, the Illustrations were not executed by either party, the Policy does not refer to the Illustrations, and the Policy expressly limits the terms of the insurance contract to the Policy, its riders the and Application. Accordingly, these cases provide no support for the Court to read the Illustrations into the Policy.

## 2. Modifications of the Initial Contract

 Plaintiffs alternatively contend that the parties modified the terms of the Policy to include the Illustrations because Plaintiffs allegedly made premium payments under the terms of the Illustrations and not the Policy. Plaintiffs made an initial payment of $129,830.00 to Guardian. Plaintiffs contend that this payment was made according to the Illustrations, not the Policy, which they suggest did not require such a large initial payment. Thus, Plaintiffs submit that the Illustrations were a modification of the Policy that Guardian ratified when it accepted the initial payment.

Guardian responds, correctly, that these premium payments were made in accordance with the Policy. Guardian draws the Court's attention to page three of the Policy, which lists the various initial payments due under the Policy. The sum of these payments is $129,830.00.[42] Plaintiffs do not present any evidence that Guardian's explanation of the sums listed in the Illustrations is incorrect. Accordingly, Plaintiffs have failed to raise an issue of fact that the written terms of the Policy were modified as Plaintiffs suggest after Plaintiffs initially entered the agreement.

## 3. Reformation of Contract Based on Mistake

 Plaintiffs next argue that the Policy should be reformed. Plaintiffs assume that the Illustrations are not part of the Policy for the purposes of this argument. Instead, they argue that Plaintiffs incorrectly believed that the Illustrations were part of the Policy as a result of Guardian's misrepresentations. Furthermore, Plaintiffs allege that Guardian was aware of Plaintiffs' mistake. Plaintiffs argue that Texas law supports the reformation of a contract when one party makes a mistake and the other party acts inequitably by knowingly failing to reveal the error to the innocent party. Plaintiffs rely on *Hill v. Spencer & Son, Inc.*, 973 S.W.2d 772, 775 (Tex.App.-Texarkana 1998, no pet.), and *Hamberlin v. Longview Bank and Trust Co.*, 770 S.W.2d 12, 14 (Tex.App.-Texarkana 1989, writ denied).

*Hill* and *Hamberlin* do not assist Plaintiffs. In *Hill*, the Texarkana Court of Appeals, citing *Hamberlin* (an earlier decision by the same court), stated that "a mistake by one party must be coupled with

---

**42.** Under the terms of the Policy, Plaintiffs (through Hunton's Trust) were required to pay a total of $129,830 in the first year of the Policy, consisting of a premium payment of $26,730.00 for the Basic Policy and a premium payment of $6,000.00 for a "Paid–Up Insurance Rider for a One–Year Term." Policy, at 3. Under the column titled "Policy Years Payable" next to each of these items is the statement "For Life." *Id.* Plaintiffs also bought a "Single Purchase Paid–Up Additions Rider" which required a single payment of $97,100.00. *Id.* Thus, under the terms of the Policy, Plaintiffs obligated the Trust to pay annually $32,730.00 (the sum of $26,730.00 and $6,000.00) for life, after the initial additional payment of $97,100.00. *Id.*

fraud or inequitable conduct by the other party to support reformation." *Hill,* 973 S.W.2d at 775.[43] "Knowledge of the mistake by one party and his failure to reveal it to the other party amounts to such inequitable conduct as will justify reformation." *Id.*

However, the circumstances under which the *Hill* and *Hamberlin* courts granted reformation were materially different from the circumstances in the present case. First, this Court would have to find that Guardian initially agreed to the terms of the Illustrations as a contract.[44] Nothing in the Application reasonably suggests that Plaintiffs could reasonably assume that Guardian had *agreed* that the Illustrations, which contained projections extending forty-seven years into the future, were offered as a binding part of the proposed insurance contract. Second, the nature of the putative "mistake" made by Plaintiffs in this case fundamentally differs from the error made by the plaintiff in *Hill.* In *Hill,* the plaintiff overlooked a typographical error as to the length of the contract. All parties agreed that the contract was to be for a different time period. *Hill,* 973 S.W.2d at 774. The jury found the defendant knew of the error in the document and intentionally failed to disclose the mistake to the plaintiff in order to gain an extended contract term. In contrast, in the case at bar, Plaintiffs claim they failed to notice several express terms, some of which appear on the first pages of the Policy. These provisions should have immediately alerted Plaintiffs that the terms of the insurance contract were materially different from their understanding,

**43.** The parties in *Hill* agreed to a logging contract for eighteen months. *Hill,* 973 S.W.2d at 774–75. When the final logging deed was drafted by the defendant, however, the year that logging was to end was changed from 1995 to 1996, which extended the term of the contract to thirty months. *Id.* The plaintiff in *Hill* read and signed this deed without noticing the mistake. *Id.* When the mistake was discovered, the plaintiff brought suit to have the contract reformed. *Id.* A jury returned a verdict for the plaintiff, which was overturned by the trial court. *Id.* The Court of Appeals reversed the trial court's directed verdict and granted judgment in favor of the plaintiff. *Id.* at 776. The Court of Appeals reasoned that the defendant had originally agreed to the eighteen-month contract and knew of the error in the deed that it had drafted. *Id.* at 775. The Court of Appeals further found that the defendant did not reveal this error to the plaintiff, and that this conduct was inequitable. *Id.*

The Texarkana Court in *Hamberlin* came to a similar result. In *Hamberlin,* a purchaser and a bank agreed on the sale of land that the bank had acquired after a foreclosure. The bank drafted a deed that accidentally included additional tracts of land. The purchaser was aware of this mistake but concealed it from the bank's officers. The bank learned of the mistake and requested that a court reform the deed to reflect the parties agreement. The trial court did reform the agreement to delete the additional tracts of land, and the Court of Appeals affirmed this decision. The Court of Appeals found that the purchaser's acceptance of erroneous deed was willful and in bad faith and that it would be inequitable to allow the purchaser to keep the additional tracts of land.

**44.** Plaintiffs allege that Friedman used copies of the Illustrations in his promotion of the Policy to Plaintiffs. However, as detailed in earlier sections of this Memorandum, the Application that Plaintiffs signed for the Policy clearly stated that Friedman did not have the authority to alter any terms of the Policy or Application. Application, at 3. Furthermore, the Application stated that the terms of the Policy were limited to those contained in the Application and the Policy form. *Id.* at 4. Finally, the Application stated that "illustrations" were available at Plaintiffs' request but that cash values for Plaintiffs' policy were not guaranteed. *Id.* at 3.

Furthermore, nothing in the Policy suggests that the Illustrations should be construed as part of the Policy *per se* or the parties' agreement. Nowhere does the Policy make reference to the Illustrations. To the contrary, the Policy explicitly states that premiums would be due "For Life." Policy, at 3.

which was contrary to longstanding insurance industry practice. Plaintiffs argument flatly contradicts the factual record, since Hunton acknowledges he inquired about the "For Life" provision he saw in the Policy. Plaintiffs should have read their Policy more closely, especially after one or more significant deviations from Plaintiffs' understanding were discovered. This case is distinct from *Hill* also because there is no evidence that Guardian or Friedman acted in bad faith or willfully to deceive Plaintiffs. Thus, Plaintiffs' arguments for reformation fail as a matter of law.

## V. PLAINTIFFS' MOTION FOR LEAVE TO AMEND THE COMPLAINT

■ Plaintiffs seek leave to file a Third Amended Complaint. Plaintiffs move to assert additional theories on their contract claim against Guardian and to assert a claim for promissory estoppel. Guardian opposes the motion. This request is not timely. Moreover, Plaintiffs seek to assert claims that are futile.

■ Rule 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Price v. Pinnacle Brands, Inc.,* 138 F.3d 602, 607–08 (5th Cir.1998). However, leave to amend is by no means automatic, and the decision to grant or deny leave to amend "lies within the sound discretion of the district court." *Parish v. Frazier,* 195 F.3d 761 (5th Cir.1999); *Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 139 (5th Cir. 1993); *Little v. Liquid Air Corp.,* 952 F.2d 841, 845–46 (5th Cir.1992), *aff'd en banc,* 37 F.3d 1069, 1073 n. 8 (5th Cir.1994). In deciding whether to grant leave to file an amended pleading, the district court "may consider such factors as undue delay, bad

faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Wimm,* 3 F.3d at 139 (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)) (leave to amend denied because of bad faith and dilatory motive). However, if the district court lacks a "substantial reason" to deny leave, its discretion is not broad enough to permit denial. *Wimm,* 3 F.3d at 139.

Plaintiffs have unduly delayed in requesting this amendment. This motion was filed three months after the pleadings amendment deadline, months after Guardian's Motion to Dismiss was filed, and weeks after that motion was converted to a summary judgment motion.

The matters Plaintiffs seek to add were (or should have been) known to them years ago. In fact, Plaintiffs seek to add new legal theories they could have asserted at the outset of this case. This Court set June 29, 2001 as the deadline to amend pleadings. *See* Amended Docket Control Order signed September 28, 2001 [Doc. # 24]. The time for amending pleadings has long passed and Plaintiffs provide no probative reason for their delay.[45]

In any event, Plaintiffs' proposed claims are futile. The additional contract theories are claims for ambiguity, reformation, and modification of the Policy. The parties have extensively briefed these issues as part their submissions related to Defendant's Motion and the Court has ruled on each of them. Accordingly, Plaintiffs' motion for leave to amend their complaint to include the new contract theories of ambiguity, reformation, and modification of the Policy is denied.

---

**45.** Further, Plaintiffs' requested amendment evidences a "repeated failure to cure deficiencies by amendments previously allowed."
This is Plaintiffs' *fourth* attempt to plead viable claims.

 Plaintiffs' assertion of a promissory estoppel claim is similarly futile.[46] Promissory estoppel is a "cause of action available to a promisee who has acted to his detriment in reasonable reliance on an otherwise unenforceable promise." *Ford v. City State Bank of Palacios,* 44 S.W.3d 121, 140 (Tex.App.-Corpus Christi 2001). In Texas, the doctrine of promissory estoppel has four elements: (i) a promise; (ii) foreseeability of reliance thereon by the promisor; (iii) substantial reliance by the promisee to his detriment; and (iv) a definite finding that injustice can be avoided only by the enforcement of the promise. *Zenor v. El Paso Healthcare System, Ltd.,* 176 F.3d 847, 864 (5th Cir.1999); *Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.* 88 F.3d 347, 360 (5th Cir.1996); *City of Beaumont v. Excavators & Constructors, Inc.* 870 S.W.2d 123, 136–37 (Tex. App.-Beaumont 1993, writ denied). Construing the record in the light most favorable to Plaintiffs, the Court assumes for the purpose of the pending motions that the first three elements of promissory estoppel are satisfied. First, the Court identifies the relevant promises as Friedman's alleged statement that Plaintiffs would have to pay only the premiums listed in the Illustrations and that the Illustrations were part of the contract for insurance. Second, the Court assumes that Friedman could foresee that Plaintiffs would rely on his representations because he knew that Plaintiffs' primary concern was to obtain life insurance that would require fixed premium payments for a limited number of years.[47] Finally, based upon Hunton's affidavits, the Court assumes that Plaintiffs substantially relied upon Friedman's representations when deciding to purchase the Policy.

 Nevertheless, the record does not support a finding that injustice could be avoided only by enforcing the promise.

**46.** It is likely that Plaintiffs' claim for promissory estoppel is barred by the statute of limitations. In Texas, the statute of limitations for promissory estoppel claims is four years. TEX CIV. PRAC. & REM. CODE § 16.051 (1997); *St. Julian v. Trustees of the Agreement of Trust for Maritime Assoc.-I.L.A. Pension,* 5 F.Supp.2d 469, 473 (S.D.Tex.1998). This Court is not aware of any published Texas state court decision or federal court decision applying Texas law that explains when a cause of action for promissory estoppel accrues. Under the general Texas "legal injury" rule, however, the latest a cause of action for promissory estoppel could accrue is when the promisor breaches his promise. Plaintiffs assert that Guardian promised that the Illustrations were part of the insurance contract and that all premiums would be paid according to the policy. *See* Plaintiffs' [proposed] Third Amended Complaint, at 10 (attached to Plaintiffs' Motion [Doc. # 33] ). Plaintiffs further contend that Guardian breached this promise when it required Plaintiffs to pay premiums after the vanish date in the Illustrations. Plaintiffs take the premium payment schedule out of the context of the sheet on which it is presented. If the Illustrations are deemed part of the insurance contract, Guardian's failure to perform according to *any* of the terms in the Illustrations would breach the promise. Thus, Guardian would have breached the promise when it failed to make dividend payments as specified in the Illustrations or when the Policy's net cash value fell below the net cash value projected in the Illustrations. As discussed above, these events occurred more than four years before Plaintiffs brought the present lawsuit. As also discussed above, Plaintiffs have failed to raise a triable issue of fact that the discovery rule should apply to toll the statute of limitations in this case. Accordingly, the Court notes that it is likely that Plaintiffs' proposed promissory estoppel claim is barred by the statute of limitations.

**47.** It is unclear whether, as a matter of law, Guardian could be said to have foreseen Plaintiffs' reliance on the representations of its agent Friedman. However, the Court assumes so for the purposes of the pending motions, based upon Hunton's conclusory assertion in his affidavit that Guardian directed Friedman to make the alleged misrepresentations. Oct. 8, 2001 Hunton Aff., at 2.

To satisfy the fourth element of promissory estoppel, a promisee must show *"reasonable or justified* reliance on the conduct or statement of the [promisor]." *Allied Vista, Inc. v. Holt,* 987 S.W.2d 138, 142 (Tex.App.-Houston [14th Dist.] 1999, pet. denied); *Traco, Inc. v. Arrow Glass Co.,* 814 S.W.2d 186, 190–91 (Tex.App.-San Antonio 1991, writ denied). "[T]he doctrine of estoppel is intended to promote justice, and, therefore, the reliance of the party asserting it must have been in good faith." *Traco, Inc.,* 814 S.W.2d at 191 (internal quotations omitted). Plaintiffs have adduced no evidence to show that their reliance on Friedman's statements was reasonable. The Fifth Circuit examines the context of the promise to determine the reasonableness of reliance.[48] In this case, the express terms of the Policy and Application establish that the terms of the insurance contract are exclusively limited to those printed in those documents.[49] The Policy and Application further state that their terms may not be changed orally by Friedman. Finally, there is nothing about the Illustrations *per se* that should have induced Plaintiffs to reasonably believe that it was a guaranteed premium payment plan.[50]

The Court also concludes that application of the doctrine of promissory estoppel to this case would be inconsistent with the doctrine's underlying policy concerns. Texas courts have held consistently that the promissory estoppel doctrine is "defensive in nature and operates to prevent the loss of an existing right. It does not operate to create liability where it does not otherwise exist." *Excavators & Constructors, Inc.,* 870 S.W.2d at 137; *see also Robbins v. Payne,* 55 S.W.3d 740, at 747 (Tex.App.-Amarillo 2001). Offensive use of the doctrine—as an affirmative cause of action—is disfavored by Texas courts. *Excavators & Constructors,* 870 S.W.2d at 137. Typically, the doctrine may be used offensively "[w]here the promisee has failed to bind the promisor to a legally sufficient contract, but where the promisee has acted in reliance upon a promise to his detriment." *Wheeler v. White,* 398 S.W.2d 93, 97 (Tex.1965).[51]

In this case, in contrast, there is a valid contract for life insurance that unambiguously states that Plaintiffs are responsible for premium payments "For Life." Essentially, Plaintiffs' assertion of promissory estoppel is an attempt to use parol evidence to modify the terms of an unambiguous contract.[52] This Court concludes that

48. *See, e.g., Zenor,* 176 F.3d at 864–65 (examining the circumstances of "atwill" employment to determine whether plaintiff reasonably relied on employer's promise of continued employment, and holding that the plaintiff's reliance was not reasonable).

49. As the Court has noted above, the Policy terms clearly indicated that the Illustrations were not part of the Policy, that dividend payments were not guaranteed, and that premium payments were required for the life of the insured.

50. Everything about the Illustrations should have alerted Plaintiffs to the fact that it was not part of the insurance contract. The document is titled "Illustrations" and not "Premium Payment Schedule." The two pages of the Illustrations on which Plaintiffs rely are paginated "1 of 6" and "2 of 6." The Illustra-

tions make express reference to "attached sheets with important footnotes." The additional pages and attached sheets are not in the record before the Court, and there is no indication that Plaintiffs ever requested to see those pages or notes.

51. *See, e.g., Zenor,* 176 F.3d at 851 (discussing promissory estoppel doctrine in context of atwill employment relationship where employer expressly disclaimed any contractual obligations between employer and employee); *Traco, Inc.,* 814 S.W.2d at 189 (applying promissory estoppel doctrine to construction bid case that did not involve a contract).

52. The application of promissory estoppel here also would contravene longstanding insurance law that places a premium on the written contract between the parties.

Plaintiffs' theory of promissory estoppel undermines longstanding policies to enforce insurance contracts as they are written. Thus, Plaintiffs' attempt to amend their Complaint to include a promissory estoppel claim is futile, and Plaintiffs' motion for leave to amend is rejected.

## VI. CONCLUSION

Prior to the initiation of this suit, the statute of limitations expired on all claims asserted by Plaintiffs in their Second Amended Complaint. Furthermore, Plaintiffs' contract claims fail as a matter of law. Because the Court grants Defendant's Motion, it does not reach Defendant's other arguments in support of its request for summary judgment. The Court also denies Plaintiffs' Motion for Leave to Amend their Complaint as untimely and futile. Accordingly, it is therefore

**ORDERED** that Defendant the Guardian Life Insurance Company of America's Motion to Dismiss Plaintiffs' Second Amended Complaint [Doc. # 14] is **GRANTED.** It is further

**ORDERED** that Plaintiffs' Motion for Leave to Amend Their Complaint [Doc. # 33] is **DENIED.**